United States v. Aquart

# In the
# United States Court of Appeals
## For the Second Circuit

AUGUST TERM 2016

No. 12-5086-cr

UNITED STATES OF AMERICA,
*Appellee,*

v.

AZIBO AQUART, AKA D., AKA DREDDY, AKA JUMBO, AKA AZIBO
SMITH, AKA AZIBO SIWATU JAHI SMITH,
*Defendant-Appellant,*

AZIKIWE AQUART, AKA ZEE, NATHANIEL GRANT, AKA
CORRECTIONAL OFFICER STONE, EFRAIN JOHNSON,
*Defendants.*

On Appeal from the United States District Court
for the District of Connecticut

ARGUED:  AUGUST 29, 2016
DECIDED:  DECEMBER 20, 2018

Before: CALABRESI, RAGGI, WESLEY, *Circuit Judges.*

―――――――

On appeal from a judgment of the United States District Court for the District of Connecticut (Arterton, *J.*) sentencing defendant Azibo Aquart to death for his role in drug and racketeering related murders, Aquart raises myriad challenges to both his conviction and death sentence.

AFFIRMED as to conviction; VACATED AND REMANDED as to sentence.

Judge Calabresi concurs in the judgment, joining the opinion in part and concurring in part.

―――――――

SEAN J. BOLSER (Barry J. Fisher, *on the brief*), Federal Capital Appellate Resource Counsel Project, Brooklyn, New York; BEVERLY VAN NESS, ESQ., New York, New York, *for Defendant-Appellant*.

TRACY LEE DAYTON, JACABED RODRIGUEZ-COSS, Assistant United States Attorneys (Sandra S. Glover, Assistant United States Attorney; Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, David M. Lieberman, Attorney, Criminal Division,

Appellate Section, U.S. Department of Justice, Washington, D.C., *on the brief*), *for* John H. Durham, United States Attorney for the District of Connecticut, New Haven, Connecticut, *for Appellee.*

———————————

REENA RAGGI, *Circuit Judge*:

———————————

**TABLE OF CONTENTS**

BACKGROUND ..........................................................................7

I.   The Guilt Phase of Trial ...............................................7

A. The Prosecution Case............................................7

1.   The Aquart Drug Enterprise .............................7

2.   The Murders of Tina Johnson, James Reid, and Basil Williams ...............................................................8

a. Tina Johnson Interferes with Aquart's Drug Enterprise ...............................................................8

b. Planning the Murders.......................................9

c. The August 24, 2005 Murders......................10

d. Discovery of the Murder Victims ...............11

e. Forensic Evidence...........................................12

f. Post-Murder Inculpatory Evidence.............13

(i) Lashika Johnson Testifies to Aquart's Efforts To Destroy Evidence and to Efrain Johnson's Admissions ...............................................13

(ii) Aquart Admits Destroying Evidence .............. 14

(iii) Aquart's Efforts To Obstruct Justice ............... 15

B. The Defense Case ................................................................ 16

C. Verdict ................................................................................. 17

II. The Capital Penalty Phase of Trial ........................................ 17

A. The Prosecution Case ......................................................... 17

B. Defense Mitigating Factors ............................................... 19

C. The Penalty Verdict ............................................................ 21

D. Sentence ............................................................................... 22

DISCUSSION ...................................................................................... 23

I. Guilty Verdict Challenges ...................................................... 23

A. Sufficiency Challenge to VICAR Counts .......................... 23

1. Interstate Commerce Nexus ........................................... 24

2. Motive .............................................................................. 28

B. Perjury Challenges to Conviction ..................................... 30

1. John Taylor ...................................................................... 32

2. Lashika Johnson .............................................................. 40

C. Prosecutorial Misconduct in Summation ......................... 46

II. Sentencing Challenges ............................................................ 51

A. Standard for Reviewing Unpreserved Sentencing Challenges .......................................................................... 52

B. Prosecutorial Misconduct Pertaining to Efrain Johnson Evidence ............................................................................... 55

1. Improper Vouching ......................................................... 58

2. Misleading Characterization of Plea Allocution ........... 73

3. Denigrating Defense Strategy ........................................ 78

C. Sufficiency Challenge ...................................................84

   1. Substantial Planning and Premeditation Aggravator...86

   2. Multiple Killings Aggravator ...........................................89

D. Constitutionality Challenges to Death Penalty ....................94

   1. Per Se Eighth Amendment Challenge.............................94

   2. Proportionality Challenge ................................................99

      a. Judicial Proportionality Review Is Not Constitutionally Mandated for Capital Sentences Under the Federal Death Penalty Act.........................99

      b. Aquart's Death Sentence Is Not Constitutionally Disproportionate...........................................................103

   3. Arbitrariness Challenge ..................................................106

   4. Necessary and Proper Clause Challenge .....................112

   5. "Originalist" Challenge ..................................................121

      a. Extending Capital Punishment to VICAR and CCE Murders...................................................................123

      b. Federalism and the Federal Death Penalty in Connecticut...............................................................128

CONCLUSION ...............................................................................136

—————————

Early on the morning of August 24, 2005, drug dealer Azibo Aquart, together with his brother Azikiwe Aquart and confederates Efrain Johnson and John Taylor, donned masks and, at gunpoint, forced their way into perceived drug competitor Tina Johnson's apartment in Bridgeport, Connecticut, whereupon the men restrained her as well as fellow occupants James Reid and Basil Williams before

bludgeoning all three to death with baseball bats.[1]  After a five week trial in the United States District Court for the District of Connecticut (Janet Bond Arterton, *Judge*), the jury found Aquart guilty of conspiracy to commit violent crimes in aid of racketeering ("VICAR"), specifically, murder, *see* 18 U.S.C. § 1959(a)(5); conspiracy to traffic cocaine, *see* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 846; and six substantive crimes punishable by a possible death sentence: three for VICAR murder, *see* 18 U.S.C. § 1959(a)(1), and three for murder in connection with a continuing criminal drug enterprise ("CCE murder"), *see* 21 U.S.C. § 848(e)(1)(A).  A capital penalty proceeding followed at which the same jury unanimously voted for a death sentence on the two VICAR and two CCE murder counts pertaining to the murders of Tina Johnson and Basil Williams, but not for these crimes as pertaining to James Reid.

Aquart here appeals both his conviction and his death sentence. As to conviction, he argues that (1) the trial evidence was insufficient to support guilty verdicts on any of the charged VICAR counts, (2) the prosecution suborned perjury by witnesses John Taylor and Lashika Johnson, and (3) he was prejudiced by prosecutorial misconduct in summation.  As to sentence, Aquart's challenges fall into three categories:  (1) prosecutorial misconduct at the penalty phase, (2) insufficiency of the evidence as to certain identified aggravating

---

[1] Insofar as some of the participants in this case have the same surname, we use "Aquart" to refer to defendant-appellant Azibo Aquart.  We refer to his brother, Azikiwe Aquart, by his full name.  We similarly refer by full name to Aquart's murder confederate, Efrain Johnson; to Efrain Johnson's sister and Aquart's former girlfriend, Lashika Johnson; and to unrelated murder victim, Tina Johnson.

factors, and (3) unconstitutionality of the death penalty both generally and as applied to his case.

The panel affirms Aquart's conviction but, based on prosecutorial error, vacates his death sentence and remands the case for a new penalty hearing.

## BACKGROUND

### I.    The Guilt Phase of Trial

#### A.    The Prosecution Case

##### 1.    The Aquart Drug Enterprise

The trial evidence, viewed most favorably to the jury's verdict, showed that from at least the fall of 2004 through August 2005, Aquart headed a drug distribution enterprise in Bridgeport, Connecticut, whose base of operations was Apartment 211 at 215 Charles Street. There, Aquart or one of his lieutenants would deliver pre-packaged crack cocaine to dealers and receive drug sale proceeds from them in return.

Aquart maintained tight control over his enterprise, making frequent unannounced visits to the Charles Street apartment to ensure that drugs and sale proceeds were properly accounted for and that the organization's rules were followed. Departures from the rules brought swift and often violent consequences. Dealers who could not properly account for proceeds from crack given to them for

7

sale or who presumed to sell drugs obtained from other sources had their noses broken or knees dislocated, often by Aquart himself.

### 2. The Murders of Tina Johnson, James Reid, and Basil Williams

#### a. <u>Tina Johnson Interferes with Aquart's Drug Enterprise</u>

In the summer of 2005, Tina Johnson and her boyfriend James Reid moved into Apartment 101 at 215 Charles Street, where their friend Basil Williams was already living. Tina Johnson and Reid started purchasing crack from Aquart's dealers in Apartment 211. Later in the summer, however, when the quality of the crack sold from Apartment 211 declined, Tina Johnson sought out another supplier, and she began selling small packets of the crack she acquired from that other source out of Apartment 101, attracting some customers of the Aquart enterprise.

Prosecution witness Rodney Womble, a former Aquart lieutenant, testified that he alerted his boss to Tina Johnson's activities, prompting Aquart to confront her directly and to tell her that she had "better quit" selling crack in competition with him because he was "not playing." Gov't App'x 290. Tina Johnson ignored the warning, even when reiterated by Womble in a heated argument during which he brandished a table leg. Indeed, Tina Johnson told Womble that if she could not sell crack at Charles Street, "nobody is selling" because she would call the police and shut down

8

Aquart's operation. *Id.* at 373. Womble reported this message to Aquart, who replied that he would "take care of it." *Id.*

b.    Planning the Murders

In late August of 2005, Aquart recruited John Taylor, one of his marijuana dealers, and Efrain Johnson, the brother of Aquart's then-girlfriend Lashika Johnson, to help with "something." *Id.* at 569. Aquart did not immediately specify the nature of the task, but he promised Taylor—who testified for the prosecution—a place to sell drugs in the Charles Street apartment building.

A few days later, Aquart, accompanied by his brother Azikiwe Aquart and Taylor, purchased rolls of duct tape at a Walgreens store. The three men proceeded to the parking lot of a diner adjacent to 215 Charles Street, where they met Efrain Johnson. Taylor testified that Aquart there explained that people in the apartment building were "into his money business" and that he wanted to "take them out or move them out . . . of the building." *Id.* at 573. Azikiwe Aquart proceeded to supply the men with face masks and latex gloves while Efrain Johnson produced two baseball bats, giving one to Azikiwe Aquart and keeping one for himself. All four men then entered 215 Charles Street intent on entering Apartment 101. They abandoned their effort, however, after seeing a woman knock on the door of that apartment with no answer.

9

### c. The August 24, 2005 Murders

Very early in the morning on August 24, 2005, the same four men met again in the underground parking lot on Charles Street. Referring to Tina Johnson, Aquart reported, "I know she's there now." *Id.* at 577. As before, Azikiwe Aquart distributed masks and latex gloves to everyone, and he and Efrain Johnson took possession of two baseball bats.

The four men proceeded to enter the apartment building through the garage and to climb the stairwell to Tina Johnson's floor. Taylor saw Aquart draw a gun as he approached the door to Apartment 101 and proceeded to kick it in, breaking the doorframe. Inside the apartment, Aquart brandished the gun and shouted, "get on the ground." *Id.* at 579. Basil Williams instead retreated to his bedroom, followed by Efrain Johnson. Meanwhile, the Aquart brothers ran into the adjacent bedroom, where they found Tina Johnson and James Reid. Taylor remained in the living room, blocking the front door with a couch and keeping watch at a window. As he did so, Taylor heard the sound of duct tape being pulled off a roll. Looking into one of the bedrooms, he saw Aquart and Azikiwe Aquart using the duct tape to restrain Tina Johnson and Reid.

Taylor returned to the living room and, after a brief silence, heard a muffled, high-pitched cry. Looking into the bedroom, Taylor saw Azikiwe Aquart bludgeoning Reid with one of the baseball bats while Aquart did the same to Tina Johnson, "standing over [her] body bashing her like he was . . . at a meat market, beating [her]." *Id.* at 626.

10

When Taylor questioned what Aquart was doing, he replied, "Yo, come and get you some." *Id.* at 581. Instead, Taylor stated that he was "out of [t]here," whereupon he pushed the couch away from the front door and left the apartment. *Id.* A short while later, Azikiwe Aquart also left the apartment, taking with him Aquart's gun, Tina Johnson's cell phone, and some money found in the apartment. When these two men reconnected, Azikiwe Aquart asked Taylor if he had "hear[d] the people say our names"; Taylor replied that he had not. *Id.* at 582.

### d.     Discovery of the Murder Victims

The prosecution offered no further eyewitness testimony as to what happened in Apartment 101 after Taylor's departure. It offered considerable evidence, however, as to the state of the victims' bodies when they were discovered the next morning.

Tina Johnson's adult son, Leroy Whittingham, testified that he went to Apartment 101 at approximately 10:00 a.m. on the morning of the murders. When his knocks went unanswered, he gained entry to the apartment through an open window. Inside, he found his mother and Reid lying dead on the floor in one bedroom, with Williams dead in another bedroom, all three victims bound with duct tape. The bedrooms were covered in blood, and the living room looked as if there had been "a war in there." *Id.* at 23. Whittingham tried to exit the apartment through the front door to get help, but he found that it had been drilled shut from the inside. Instead, he

11

jumped out of an apartment window and, with the assistance of a neighbor, called 911.

e. Forensic Evidence

Law enforcement authorities responded to the 911 call and, over the course of the next three days, collected forensic evidence inside Apartment 101. First-responder testimony and crime-scene evidence showed that all three murder victims had their hands and feet bound with duct tape. Duct tape was also wrapped tightly around their heads and mouths. Medical examination showed that Tina Johnson died from "blunt force trauma," having suffered repeated blows to her head, administered with sufficient force to cause multiple skull fractures, among other injuries. *Id.* at 440. Reid and Williams also died from "blunt traumatic head injury," with multiple skull fractures. *Id.* at 113, 988–89.

Despite the killers' having worn gloves, subsequent fingerprint analysis was able to link Azikiwe Aquart to two plastic bags (one from Walgreens) recovered from Williams's bedroom, and to link Aquart to a piece of duct tape holding the two bags together. Subsequent DNA analysis linked Efrain Johnson to a latex glove fragment stuck in duct tape cut from Tina Johnson's hands and wrists. DNA analysis also linked various retrieved evidentiary fragments— somewhat more qualifiedly—to Azibo and Azikiwe Aquart as well as to the three victims. On some retrieved fragments, examiners found more than one person's genetic markers. On other fragments,

examiners could not eliminate Aquart, Taylor, or the victims as DNA contributors.[2]

### f.　Post-Murder Inculpatory Evidence

#### (i)　Lashika Johnson Testifies to Aquart's Efforts To Destroy Evidence and to Efrain Johnson's Admissions

Lashika Johnson, the sister of Efrain Johnson and, in August 2005, Aquart's girlfriend, testified that, on the morning of August 24, 2005, she awoke to find both Aquart brothers and her own brother in her apartment. The Aquart brothers were wearing only their underwear. Aquart proceeded to give her some garbage bags containing clothing and a black drill, which he told her to throw in a dumpster. Aquart further ordered Lashika Johnson to drive his car to his apartment, to park it in a manner that suggested he had been home all day and night, and then to retrieve some clothes for him.

---

[2] Christine Roy, a forensic science examiner from the Connecticut State Forensic Laboratory, testified that a cannot-be-eliminated conclusion meant that she had identified a significant number, but not all, of a person's genetic markers on a retrieved sample. Thus, a vinyl glove retrieved from Tina Johnson's and Reid's bedroom revealed a mixture of DNA to which Roy concluded Aquart, Azikiwe Aquart, Reid, and Williams had each contributed because she detected *all* of each person's genetic markers on the glove. By contrast, because she detected a significant number, but not all, of the genetic markers of Tina Johnson and Taylor on the glove, these persons could not be eliminated as DNA contributors. Similarly, Roy could conclude that Reid contributed to the DNA mixture detected on a latex fragment retrieved from under the cushion of a couch pushed against the front door because all of his genetic markers were present, and that Aquart could not be eliminated as a contributor because 28 of his 30 markers were detected.

13

When Lashika Johnson had performed these tasks and returned to her apartment, only Aquart was still there. He received a call on his cell phone during which Lashika Johnson heard him say, "why would you take a cell phone from . . . why would you be calling me from this cell phone[?]" *Id.* at 723. Telephone records showed that at 10:25 a.m. on the morning of the August 24 murders—after Tina Johnson's dead body had already been discovered by her son—Aquart's cell phone was called by Tina Johnson's cell phone, which Azikiwe Aquart had taken from the murder scene.

Lashika Johnson further testified that sometime later, but before his own arrest, her brother discussed the events of August 24 with her. Efrain Johnson admitted being in Apartment 101 that morning with the Aquart brothers and an unnamed fourth person (Taylor) who did not live in Bridgeport. Efrain Johnson said that he had "helped tie the people up and rough them up a little bit," but he maintained that the occupants were "still alive" when he left the apartment, leaving only Aquart with the victims. *Id.* at 727–28. Efrain Johnson further reported that the men had gotten rid of the gloves, masks, and bats used in the attack before arriving at his sister's apartment on the morning of August 24.

(ii) <u>Aquart Admits Destroying Evidence</u>

In September 2005, while in the Bridgeport Correctional Center, Aquart (arrested for violating parole) told Taylor (arrested for selling drugs) that he had had his "baby momma g[e]t rid of the weapons"

14

from the night of the murders, an apparent reference to Shante Pettway.  *Id.* at 586.

### (iii)    Aquart's Efforts To Obstruct Justice

Aquart was arrested in this case in 2007.  In 2009–10, while incarcerated awaiting trial, he engaged in various efforts to obstruct justice, manifesting consciousness of guilt.

In October 2009, Aquart wrote to Venro Fleming, a member of his drug organization, stating that if federal authorities contacted Fleming, he should say that there was no "gang" working for Aquart and that "EVERYONE DID THEIR OWN THING."  *Id.* at 1941 (capitalization in original).  Aquart explained that this was important because the charge against him was conspiracy, which means "when TWO OR MORE people get together to do something illegal.  If people were doing what they do on their own, there is no conspiracy. . . ."  *Id.* (capitalization in original).  Aquart told Fleming to pass this message on to others from Charles Street: "let them know the deal if you care about them," concluding that he hoped Fleming "got the message."  *Id.* at 1942.

In early 2010, Aquart told Shamarr Myers, a convicted drug dealer whom Aquart had befriended while incarcerated, that he had sold crack in Bridgeport, but had had some problems with others selling crack in the same building and decided, first, that "they had to go" but, eventually, that "they had to die."  *Id.* at 911.  Soliciting Myers's help, Aquart prepared a letter detailing exactly what Myers was to do.  Among the urged actions was for Myers to have a

15

"courtroom outburst" when testifying at Aquart's trial. *Id.* at 1936. Specifically, Myers was to declare that "[e]verybody" knew that "Letho" had killed Tina Johnson, Reid, and Williams, and that Letho had confessed as much to Myers's friend "Simone." *Id.* The letter told Myers to "point [his] finger at pros[ecutors] and agents at the table" and testify that they had solicited his testimony against Aquart without caring whether Myers actually knew anything about the murders. *Id.* at 1938. Myers was further to say that these officials had told him that all he had to do was remember what they told him about "people's names, dates, times," and "about . . . bags and bats," in return for which they would arrange for his early release from prison. *Id.*

Instead, Myers brought Aquart's communication to the attention of the authorities and testified as a prosecution witness.

## B.    The Defense Case

The defense called various law enforcement officials to testify to inconsistent pre-trial statements made by various witnesses cooperating with the government, including Lashika Johnson and John Taylor. It urged the jury not to find these witnesses credible insofar as they inculpated Aquart. Indeed, the defense insinuated that Taylor was not even in Apartment 101 at the time of the murders and, thus, could not credibly testify to who was then inside the apartment or to what had happened.

16

## C.     Verdict

On May 23, 2011, the jury found Aquart guilty on the six capital and two non-capital charges against him.  The case then proceeded to a capital penalty proceeding on the three VICAR murder counts as to Tina Johnson, Reid, and Williams (Counts Two, Three, and Four), and the three CCE murder counts as to the same victims (Counts Five, Six, and Seven).

## II.     The Capital Penalty Phase of Trial

### A.     The Prosecution Case

In urging the death penalty, the prosecution maintained that Aquart was over 18 at the time of the charged murders and that he had acted with the requisite culpable intent, as required by 18 U.S.C. § 3591(a) and 21 U.S.C. § 848(n)(1) (1996).  Further, it relied on five statutory aggravating factors, specifically, that Aquart had (1) committed each proved murder in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse; (2) procured commission of the murders by payment, promise of payment, or anything of pecuniary value; (3) committed the murders in consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value; (4) committed the murders after substantial planning and premeditation to cause the deaths of the victims; and (5) intentionally killed more than one person in a single criminal episode.  *See* 18 U.S.C. § 3592(c); 21 U.S.C. § 848(n) (1996).  It also relied on two non-statutory aggravating factors: (6) Aquart's engagement in a continuing pattern of violent criminal conduct

17

posing a serious threat to the lives and safety of persons in addition to the three murdered victims; and (7) the severe and irreparable harm the murders caused the victims' families.

In support of these factors, the prosecution relied on the evidence already adduced at the guilt phase of trial. In addition, as to the first statutory factor—the heinous, cruel, and depraved manner of the murders—the prosecution offered expert testimony that blood stain patterns on the walls and ceiling of the bedroom where Tina Johnson and Reid were found dead indicated that these victims were beaten "many, many times," from multiple angles, and with a "great amount of force." Gov't App'x 1182, 1184. Moreover, the object used to administer the beating had to have had a sufficient surface area to hold a large amount of blood and had to have been long enough that, when raised, it would propel so much blood onto the ceiling that it subsequently flowed down the walls. The same expert testified that the majority of blood stains in Williams's room were in the area around his head.

In support of the first non-statutory factor—Aquart's pattern of violence—the prosecution supplemented its guilt phase evidence of four assaults with proof of two further incidents—one while Aquart was at liberty, the other while he was detained—where he had attacked persons with sufficient force that they required hospital

18

treatment.[3]  In support of the second non-statutory factor—familial harm—the prosecution offered the live testimony of six relatives of the deceased victims as well as letters from many more.

## B.      Defense Mitigating Factors

Aquart presented the jury with 28 factors mitigating against a death sentence.  Nineteen concerned hardships and privations he experienced as a child, including his parents' drug dealing, his father's imprisonment and deportation when Aquart was 11, and his mother's drowning death when Aquart was 12, after which he failed to receive adequate care and supervision.  Other mitigating factors included an assertion that the victims' own drug trafficking contributed to their deaths, the fact that confederates Taylor and Efrain Johnson were not facing the death penalty, the life sentence

---

[3] The six assaults on which the government relied to prove the pattern aggravator were as follows:

Jackie Bryant (November 2004)—When she is short approximately $100 on drug proceeds owed to Aquart, he punches her until she loses consciousness.  She sustains injury to her knee resulting in permanent scarring.

Venro Fleming (February 2005)—Thinking that Fleming owes him money for missing crack cocaine, Aquart assaults Fleming, fracturing his nose and cutting his eye and lip.

Frank Hodges (May 2005)—In retaliation for Hodges selling drugs from another supplier, Aquart fractures his nose and blackens his eye.

Juanita Hopkins and John Sullivan (July 2005)—Upon learning that Aquart worker Hopkins has allowed her brother, Sullivan, to sell others' drugs from apartment 211, Aquart pistol-whips both of them, with Sullivan requiring stitches to his head and ear.

Anthony Armstead (October 2009)—Aquart confronts Armstead in prison and strikes him repeatedly in the head, requiring stitches to his head, both eyes, lip, and ear.

19

Aquart would serve if the jury did not vote for death, and the ability of the Bureau of Prisons to confine Aquart safely and securely for life.

In support of his mitigator about the lesser penalties faced by Taylor and Efrain Johnson, Aquart called FBI Agent Christopher Munger to testify to accounts of the murders provided by Efrain Johnson in various interviews.[4] In these statements, Efrain Johnson acknowledged that he, Aquart, Azikiwe Aquart, and Taylor (referred to only as "the Big Dude") were the four men who entered Apartment 101 on August 24, 2005. But he attributed a larger role in the crime to Taylor than Taylor had admitted during his testimony. Specifically, Efrain Johnson stated that it was Taylor who had led the push into the apartment and that it was Taylor who had ordered Efrain Johnson to bind Tina Johnson (identified by Efrain Johnson only as "the woman") with duct tape. Meanwhile, the Aquart brothers pushed a man unknown to Efrain Johnson into one of the back bedrooms. When Taylor grew frustrated with how long it was taking Efrain Johnson to restrain Tina Johnson, Taylor took the duct tape and completed the task himself. Efrain Johnson further told law enforcement officials that it was Taylor who punched Tina Johnson in the face when she started screaming, and who beat her in the head with a two-inch thick, ten-inch long metal pipe that he pulled from the side of his pants. Efrain Johnson stated that it was at that point

---

[4] Aquart could not introduce such hearsay statements at the guilt phase of the trial, but was permitted to do so at the penalty phase pursuant to 18 U.S.C. § 3593(c) (allowing admission of information at capital sentencing proceeding "regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice").

20

that he ran out of the apartment and waited in a car for the others to leave the apartment.

## C. The Penalty Verdict

After three days of deliberation, the jury returned its penalty verdict, unanimously finding that Aquart should be sentenced to death for the racketeering and drug related murders of Tina Johnson and Basil Williams. The jury was unable to reach unanimity as to whether Aquart should be sentenced to death for the murder of James Reid.

In the special verdict informing its decision, the jury reported unanimously finding that the government had established each of the five statutory aggravating factors and each of the two non-statutory aggravating factors beyond a reasonable doubt. It reported unanimously finding 25 of the defense's 28 mitigating factors proved by the requisite preponderance of the evidence. Among the mitigators unanimously found so proved was the fact that other participants in the murders—specifically, Taylor and Efrain Johnson—were not facing the death penalty. As to the remaining three mitigators, nine jurors were persuaded that Aquart lacked adequate parental supervision throughout his childhood, two found that he lacked meaningful adult supervision from the time of his mother's death, and nine found that he was exposed to emotional and physical abuse inflicted on his mother. The jury itself unanimously identified as another mitigator the fact that Aquart had a child.

21

The jury nevertheless found beyond a reasonable doubt that the aggravating factors sufficiently outweighed the mitigating factors to warrant a death sentence.[5]

### D.    Sentence

After rejecting various defense motions for a new trial or penalty proceeding, the district court, on December 18, 2012, sentenced Aquart to death on Counts Two and Five for the VICAR and CCE murder of Tina Johnson, and on Counts Four and Seven for the VICAR and CCE murder of Basil Williams.  It sentenced the defendant to consecutive life sentences on Counts Three and Six for the VICAR and CCE murder of James Reid, and on Count Eight for conspiracy to traffic in 50 grams or more of crack cocaine.  It imposed a further consecutive prison sentence of ten years for VICAR conspiracy to murder.[6]

This timely appeal followed.

---

[5] The government acknowledges that federal law requires a capital jury to find that aggravating factors sufficiently outweigh mitigating factors "to justify a sentence of death," 18 U.S.C. § 3593(e), but submits the finding need not be beyond a reasonable doubt. *See United States v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007); *United States v. Barrett*, 496 F.3d 1079, 1107–08 (10th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345–46 (5th Cir. 2007).  We do not decide the question here because the jury was specifically instructed that its weighing determination had to be made beyond a reasonable doubt, and the government urges a lesser standard only in a footnote.  *See United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.").

[6] On the government's motion, the district court dismissed Count Ten, which had charged Aquart with possession of a firearm by a convicted felon.

## DISCUSSION

Before addressing Aquart's capital sentence, we consider his challenges to the guilty verdict and unanimously affirm that part of the judgment of conviction.

## I.    Guilty Verdict Challenges

### A.    Sufficiency Challenge to VICAR Counts

Aquart argues that the evidence was insufficient as a matter of law to support a guilty verdict on the single conspiracy and three substantive VICAR counts for which he stands convicted. While we examine a sufficiency challenge *de novo*, the defendant bears a heavy burden because we must view the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Sheehan*, 838 F.3d 109, 119 (2d Cir. 2016) (internal quotation marks omitted). In doing so, we consider the evidence "in its totality, not in isolation," *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks omitted), and we "will sustain the jury's verdict if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" *United States v. Pierce*, 785 F.3d 832, 837 (2d Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in *Jackson*)).

23

Aquart does not here dispute the sufficiency of the evidence to prove that, together with others, he conspired to, and did in fact, murder Tina Johnson, James Reid, and Basil Williams. Rather, he submits that the evidence failed to establish either (a) VICAR's jurisdictional requirement of an interstate commerce nexus or (b) its motive requirement that the murders have been committed to maintain or increase Aquart's position in the charged drug enterprise. The argument is defeated by both controlling law and the evidentiary record.[7]

### 1. Interstate Commerce Nexus

To secure conviction on any of the four VICAR counts, the government was required to prove that Aquart's racketeering enterprise "engaged in," or that its "activities . . . affect[ed], interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). This burden is not a heavy one, and can be satisfied by "even a *de minimis* effect on interstate commerce." *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008); *see also United States v. Davila*, 461 F.3d 298, 306 (2d Cir. 2006).

Such an effect was here shown by evidence that Aquart and enterprise confederates used firearms and ammunition that had crossed state lines in furthering their criminal objectives. Toward the same end, they used instrumentalities of commerce to travel interstate. *See United States v. Mejia*, 545 F.3d at 203–04 (ruling that

---

[7] Aquart acknowledges that both parts of his VICAR sufficiency challenge "are foreclosed by the caselaw of this Circuit, which this Court is bound to apply," but he raises them nonetheless in order to preserve the issues for *en banc* and Supreme Court review. Appellant's Br. 228.

enterprise members' purchase of firearms that had crossed state lines as well as their own interstate travel to conduct enterprise-related activities satisfy interstate nexus).

But more, the requisite interstate commerce was here satisfied by evidence that the enterprise trafficked in crack cocaine. In *Gonzales v. Raich*, 545 U.S. 1 (2005), and more recently in *Taylor v. United States*, 136 S. Ct. 2074 (2016), the Supreme Court has recognized that drug trafficking, even local trafficking, is "part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. at 17, 22 (recognizing Congress's Commerce Clause authority to criminalize production, possession, and sale of controlled substances, even when activity is purely local); *accord Taylor v. United States*, 136 S. Ct. at 2080 (applying *Raich* to Hobbs Act drug robberies). In the interval between these decisions, this court reached a similar conclusion in rejecting a sufficiency challenge to the interstate commerce element of the Hobbs Act. *See United States v. Needham*, 604 F.3d 673, 680–81 (2d Cir. 2010). The charged Hobbs Act robberies in *Needham* targeted heroin and cocaine supplies. Observing that such drugs "necessarily travel in interstate commerce," we concluded that a jury was entitled to infer, based simply on its lay knowledge, and unassisted by expert testimony, that such drugs are imported into the United States so as to affect

25

interstate and foreign commerce. *Id.* at 680–81; *see United States v. Gomez*, 580 F.3d 94, 102 (2d Cir. 2009).[8]

No different sufficiency conclusion is warranted here because the interstate commerce element is part of the VICAR statute, *see* 18 U.S.C. § 1959 (pertaining to enterprise "engaged in, or the activities of which affect, interstate or foreign commerce"), rather than the Hobbs Act, *see id.* § 1951 (pertaining to robbery that "affects commerce"). Both statutes fall within Chapter 95 of Title 18, entitled "Racketeering," and this court has drawn on Hobbs Act precedent in rejecting a sufficiency challenge to VICAR's interstate commerce element. *See United States v. Mapp*, 170 F.3d 328, 336 (2d Cir. 1999) (rejecting sufficiency challenge to § 1959 VICAR conviction by reference to *United States v. Taylor*, 92 F.3d 1313, 1333 (2d Cir. 1996)). In any event, insofar as the murder of a rival drug dealer completely removes a competitor from the market, whereas the robbery of such a dealer's supply does so only to a degree, we conclude that VICAR murders to preserve a drug trafficking monopoly, as here, affect interstate commerce as much as the Hobbs Act drug robberies at issue in *Needham*.

---

[8] To the extent *Needham* did not extend this conclusion to marijuana because it could be "grown, processed, and sold entirely" intrastate, *United States v. Needham*, 604 F.3d at 676, that part of its holding was expressly abrogated by *Taylor v. United States*, 136 S. Ct. at 2080–81 (explaining that "*Raich* established that the purely intrastate production and sale of marijuana is commerce over which the Federal Government has jurisdiction," and concluding therefrom that "if the Government proves beyond a reasonable doubt that a robber targeted a marijuana dealer's drugs or illegal proceeds, the Government has proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected").

Aquart argues nonetheless that *Needham* runs afoul of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in that a "presumption" that cocaine travels in interstate commerce "effectively absolves the jury from finding" that fact as "an element of the offense." Appellant's Br. 229. The argument fails because *Needham* does not establish a presumption; rather, it permits an inference. *See United States v. Needham*, 604 F.3d at 679–80. The jury must still find proved the facts that support the inference. *See id.* at 678. As the Supreme Court explained in *Taylor v. United States*, the standard of proof cannot be confused with the element that must be proved. 136 S. Ct. at 2080. Both VICAR and the Hobbs Act include a commerce element, which the government must establish beyond a reasonable doubt, "but the meaning of that element is a question of law." *Id.* Thus, in the Hobbs Act context, "if the Government proves beyond a reasonable doubt that a robber targeted a . . . dealer's drugs or illegal proceeds," *Taylor* holds that "the Government has proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected." *Id.* at 2080–81. So in the VICAR context here, if the government adduced sufficient evidence to prove that Aquart and his confederates murdered a perceived drug rival, the government has carried its burden to prove that the murder affected interstate commerce.

As detailed *supra*, Background Section I.A., the government offered ample evidence—from former enterprise members, cooperating witnesses, and law enforcement officers—that the primary focus of the Aquart enterprise was drug trafficking; the

27

enterprise exercised exclusive control over the distribution of crack cocaine at 215 Charles Street; in 2005, enterprise leader Aquart perceived Tina Johnson as a drug rival who threatened the enterprise's monopoly; and Aquart murdered Tina Johnson and two others in order to eliminate that competition. Under controlling Supreme Court and circuit precedent, such evidence, viewed most favorably to the government, sufficed to prove beyond a reasonable doubt "that commerce over which the United States has jurisdiction was affected" by the charged VICAR murders. *Id.* at 2081; *see United States v. Needham*, 604 F.3d at 680–81.

### 2.    Motive

Although Aquart does not challenge the proof of either his participation in the charged murders or his leadership of the racketeering enterprise, he argues that the evidence was insufficient to link the two so as to establish the requisite motive, specifically, that Aquart murdered "for the purpose of . . . maintaining or increasing [his] position" in the racketeering enterprise. 18 U.S.C. § 1959(a).

This argument fails because VICAR's motive element can be satisfied by evidence that allows a jury to "infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001) (internal quotation marks omitted). Thus, we have affirmed VICAR convictions where violent crimes are "committed or sanctioned by high ranking leaders of the enterprise

28

for the purpose of protecting the enterprise's operations and furthering its objectives." *Id.* That is this case.

Various witnesses testified to Aquart's expressed frustration with Tina Johnson's sale of crack cocaine on what he perceived to be his enterprise's territory, and with her defiance of his orders to stop such sales. The jury heard confederate Taylor testify that Aquart explained to his murder accomplices, as they were about to enter Apartment 101, that the defendant needed to get occupant Tina Johnson out of "his money business." Gov't App'x 573. They heard Shamarr Myers testify that, after the murders, Aquart had told him that persons who had attempted to sell drugs in competition with him "had to die." *Id.* at 911. Such evidence was sufficient for a reasonable jury to conclude that Aquart orchestrated and participated in the charged VICAR crimes in order to "protect[] the enterprise's operations and further[] its objectives." *United States v. Dhinsa*, 243 F.3d at 671.

Aquart acknowledges that *Dhinsa* defeats the motive prong of his VICAR sufficiency challenge, but he urges that *Dhinsa* should be overruled because its holding "cannot be squared with the plain language of § 1959, which . . . sweeps more narrowly to cover only a defendant's own personal position." Appellant's Br. 229–30. The proposition that VICAR's motive element is satisfied by proof that a defendant committed the crime "because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership" was first announced in *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992), and is

29

well-settled in this circuit, *see United States v. Dhinsa*, 243 F.3d at 671–72 (collecting cases). This panel is bound by that precedent and not inclined, in any event, to depart from it. *See Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014) (reiterating rule that "a panel of this Court is bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court" (internal quotation marks omitted)).

Moreover, we conclude that the motive element would be satisfied even under Aquart's narrow reading of the statute. He was the leader of the charged enterprise, and the evidence was sufficient to allow a reasonable jury to infer that he "was expected to act based on the threat posed to the enterprise" by Tina Johnson's drug sales, "and that failure to do so would have undermined *his position* within that enterprise." *United States v. Dhinsa*, 243 F.3d at 671 (emphasis added); *see United States v. Diaz*, 176 F.3d 52, 95–96 (2d Cir. 1999).

Thus, defendant's sufficiency challenge to his VICAR convictions fails on the merits.

## B. Perjury Challenges to Conviction

Aquart argues that all counts of conviction were tainted by the perjured testimony of prosecution witnesses John Taylor and Lashika Johnson, specifically, by Taylor's understatement of his expectations for sentencing consideration and by Lashika Johnson's denial of prosecution threats during a proffer session. To pursue relief from conviction based on claimed perjury, Aquart must make a threshold showing that each of these witnesses in fact willfully testified falsely

30

and that the falsehoods were not known to him at the time of trial.  *See United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006); *see also United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (stating that "witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory").  Such a showing does not, by itself, warrant a new trial.  *See United States v. Stewart*, 433 F.3d at 297.  At that point, the court must "strike a fair balance between the need for both integrity and finality in criminal prosecutions."  *Id.* (internal quotation marks omitted).  To do that, the court must assess the materiality of the false statements, applying one of two standards depending on the prosecution's awareness of the falsehoods at the time of trial.  If the prosecution knew, or should have known, of the false testimony prior to the conclusion of trial, the conviction must be set aside if there is "any reasonable likelihood" that the testimony could have affected the jury's judgment.  *United States v. Cromitie*, 727 F.3d 194, 221–22 (2d Cir. 2013) (internal quotation marks omitted) (collecting cases).  If the government was unaware of the falsity at the time of trial, a new trial is warranted if the court is left with the "firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."  *United States v. Stewart*, 433 F.3d at 297 (internal quotation marks omitted).

Applying these principles here, we conclude that neither of Aquart's perjury claims warrants relief.

31

### 1.     John Taylor

At the time Taylor testified at Aquart's trial, he himself had pleaded guilty to three substantive VICAR counts pursuant to a plea agreement that allowed him to face three mandatory life sentences rather than the death penalty.  *See* 18 U.S.C. § 1959(a)(1).  Taylor had also entered into a cooperation agreement that held out the possibility of a government motion for a lesser, non-mandatory sentence if Taylor provided "substantial assistance in the investigation or prosecution of another person."  Gov't App'x 1819 (citing 18 U.S.C. § 3553(e), U.S.S.G. § 5K1.1).

At the conclusion of Taylor's direct examination, the government elicited the following testimony about Taylor's motives for testifying and his sentencing expectations:

| | |
|---|---|
| Prosecution: | Why are you testifying? |
| Taylor: | To tell the truth. |
| Prosecution: | Why? |
| Taylor: | People got killed for no reason.  They shouldn't got killed.  When I said they shouldn't got killed, it never should have gone to the point it went to. |
| . . . | |
| Prosecution: | What are you hoping happens to you? |

32

| Taylor: | Lesser sentence. |
| --- | --- |
| Prosecution: | Do you think you are going to go home tomorrow? |
| Taylor: | No. |
| Prosecution: | When do you think you are going to go home? |
| Taylor: | I don't think I'm never going home. |

*Id.* at 593–94.

Aquart voiced no objection to these inquiries at trial. Nor did his attorney attempt to impeach any of Taylor's above-quoted responses despite a two-day-long cross-examination that repeatedly reminded the jury of various lies that Taylor had told law enforcement officers. *See, e.g., id.* at 623–24. Instead, for the first time on appeal, Aquart suggests that Taylor's quoted statement—"I don't think I'm never going home"—falsely understated his expectations for sentencing consideration based on his cooperation.

Aquart concedes that, on the present record, he cannot make the showings necessary to secure a new trial based on perjured testimony. He submits that he should not now have to do so because he is not yet demanding a new trial, but only a hearing "to determine whether Taylor falsely understated his sentencing expectations." Appellant's Reply Br. 22.

Because Aquart did not seek such relief in the district court, the government urges us to review only for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Marcus*, 560 U.S. 258, 262 (2010) (stating that defendant claiming plain error must show (1) error; (2) that is clear or obvious, rather than subject to reasonable dispute; (3) affecting his substantial rights; and (4) calling into question the fairness, integrity, or public reputation of judicial proceedings); *see also United States v. Ferguson*, 676 F.3d 260, 282 (2d Cir. 2011) (stating that plain error standard would apply to forfeited perjury claim). Aquart maintains that plain error review is inapplicable because his attorney could not have requested a perjury hearing in the district court when he was not yet aware of facts supporting such a claim. *See* Fed. R. Crim. P. 51(b). Specifically, Aquart asserts that, at the time of trial, defense counsel did not know that a cooperator in another murder case (Mario Lopez), who had testified against a former client (Fausto Gonzalez) of Taylor's attorney, had received a five-year sentence in consideration of his cooperation. Nor did Aquart's counsel then know that Taylor's attorney would reference Lopez's single-digit sentence in urging leniency at Taylor's own sentencing proceeding.[9] Aquart argues that,

---

[9] The district court sentenced Taylor to a total prison term of nine years. In doing so, Judge Arterton explained that she had seen Taylor testify at both Aquart's and Efrain Johnson's trials, and found him credible at each. Moreover, she understood each jury to have found him credible and, specifically, more credible than Efrain Johnson, who testified at his own trial. *See* Gov't App'x 1578 (observing that "juries are pretty good at telling who's been truthful"). The district judge further noted that her sentence was informed by Taylor's sincere remorse and his intellectual limitations, as described by a psychiatrist. As to the latter, she concluded that Taylor's limitations likely prevented him from understanding that Aquart intended to murder his victims until Taylor saw Aquart beat Tina Johnson to death. Nevertheless, the district court concluded that a sentence of at least nine years was

34

on these facts, justice demands a perjury hearing because it is "unfathomable" that Taylor's counsel did not relay his knowledge of Lopez's sentence to Taylor, Appellant's Br. 103, and, thus, it is "virtually certain" that, when Taylor testified against Aquart, he knew that he could receive a considerably reduced sentence, making it false for him to state that he thought he would never be released from jail, *id.* at 101. The reasoning is flawed in several respects.

First, even if Aquart can avoid plain error review, he cannot avoid the "threshold" requirement to show actual falsity to secure judicial consideration—whether by hearing or otherwise—of a perjury challenge to conviction. *United States v. Stewart*, 433 F.3d at 297 (internal quotation marks omitted). It is such a showing that first tips the balance of judicial interest away from the finality of the judgment and toward a concern with the integrity of the conviction. Once actual falsehood has been shown, hearings may determine when the parties knew (or should have known) of the falsehood and its materiality to the judgment. Such further inquiry determines what, if any, relief is warranted. But until actual falsity is shown, there is no concern for the integrity of the process requiring judicial hearings. *See United States v. Sasso*, 59 F.3d 341, 350–51 (2d Cir. 1995) (upholding denial of hearing regarding perjury by trial witness where defendants did not sufficiently establish that witness's statements were false).

---

necessary "[t]o reflect the seriousness of the crime" and Taylor's role in it, even though his involvement was at a "very much different level[]" than Aquart's. *Id.* at 1578–79.

Here, not only has Aquart failed to show that Taylor's challenged statement was false, but also, it is doubtful that the statement is even susceptible to proof of truth or falsity. It states no present or past matter of fact, such as the benefits identified in his cooperation agreement or discussed with him by government officials, his own lawyer, or the court. Rather, the statement is an expression of subjective belief about the likelihood of a future event. *See United States v. Stewart*, 686 F.3d 156, 176 (2d Cir. 2012) ("'To be false, the statement must be with respect to a fact or facts and the statement must be such that the truth or falsity of it is susceptible of proof.'" (quoting *United States v. Endo*, 635 F.2d 321, 323 (4th Cir. 1980))).

Second, and in any event, the facts Aquart adduces to support his perjury hypothesis do not compel a hearing. To begin, the murderous cooperator Lopez was sentenced on April 24, 2008, more than two years before Taylor's October 18, 2010 guilty plea, and more than three years before the May 4, 2011 start of Taylor's testimony against Aquart. Thus, it is hardly "certain," as Aquart maintains, that Taylor's counsel—who did not represent Lopez, but a person against whom Lopez had cooperated—had both learned of Lopez's sentence and communicated it to Taylor *before* Taylor testified at Aquart's trial. Appellant's Br. 101, 103. Aquart can only speculate as to such matters, which is insufficient to warrant a hearing. *See Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (recognizing that "conclusory assertions" do not warrant evidentiary hearing on habeas petition (internal quotation marks omitted)); *United States v. Watson*, 404 F.3d

36

163, 167 (2d Cir. 2005) (same re: suppression hearing); *United States v. Singh*, 390 F.3d 168, 183–84 (2d Cir. 2004) (same re: challenge to warrant affidavit); *United States v. Difeaux*, 163 F.3d 725, 729 (2d Cir. 1998) (same re: sentencing hearing).

Equally speculative, moreover, is Aquart's hypothesis that the government was aware of the alleged falsehood at the time of trial. Because one of the prosecutors at his trial also appeared for the government in the Taylor, Lopez, and Gonzalez prosecutions, Aquart contends that the government (1) not only knew Lopez's sentence, but must have known (2) that Taylor's counsel had learned of Lopez's sentence, *and* (3) that Taylor's counsel told Taylor about Lopez's sentence before trial, so that (4) based on the information counsel provided, Taylor thought he, too, would receive a considerable sentencing reduction, and (5) falsely represented his release expectations at Aquart's trial. No evidence supports the second through fifth links in this chain of alleged government knowledge.

Indeed, even if we were to assume *arguendo* that, at a hearing, Aquart could show that Taylor knew of Lopez's sentence, and that the prosecutor was aware of Taylor's knowledge, that would not establish the falsity—much less the willful falsity—of Taylor's professed release expectations, nor the government's subornation of perjury. At the time of Aquart's trial, Taylor faced mandatory life imprisonment. His ability to secure any lesser sentence was contingent on two events: (1) the government's filing of a motion pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1, and (2) the district court's grant of that motion coupled with its determination

37

that a sentence of less than life incarceration satisfied 18 U.S.C. § 3553(a). Neither of these events had occurred at the time Taylor testified, and Taylor knew from both his cooperation agreement and the district court's statements at the time of his guilty plea that he could not count on their occurrence. *See* Gov't App'x 1819 (stating in cooperation agreement that determination whether to file motion for sentence reduction "rests solely with the Government" and that, even if motion is filed, district court "is under no obligation to grant or act favorably upon the motion"); *id.* at 1560 (confirming at plea allocution that no sentencing promises had been made to Taylor and advising that "no one knows what your sentence will actually be until it is imposed on the day of sentencing"). Thus, Taylor might well have thought that, until the requisite contingencies occurred, he faced a mandatory life sentence that would not allow him ever to go home.

Construing Taylor's response as things stood at the time of his testimony—and not after possible future government and court action—is, moreover, consistent with its context. In response to a preceding question, "What are you hoping happens to you?," Taylor plainly acknowledged that he was hoping for a "[l]esser sentence." *Id.* at 594. Taylor reiterated that hope on redirect, explaining that, in testifying at Aquart's trial, he was "looking for help" in his own case. *Id.* at 624. The profession of a pessimistic present release expectation cannot be deemed willfully misleading when thus coupled with acknowledged hope that, in the end, the witness would receive a lesser sentence. Any reasonable jury would have understood from the totality of Taylor's testimony that, however likely he then thought

38

a life sentence, he retained the hope of receiving a lesser sentence by testifying against Aquart.

Thus, Taylor's professed release expectation did not deny the defense its argument that Taylor's motive in testifying against Aquart was to secure a reduced sentence. Indeed, a defense attorney might reasonably argue that Taylor's pessimistic release expectation gave him a *greater* motive to help the government obtain Aquart's conviction, because only such significant assistance could secure him relief from what he knew was otherwise a mandatory life sentence. Further, the district court instructed Aquart's jury that the testimony of witnesses, such as Taylor, who had entered into cooperation agreements with the government, had to be considered "with particular caution" precisely because such agreements gave hope for reduced sentences. *Id.* at 1053–54.

In short, the facts Aquart proffers on appeal about cooperator Lopez's reduced sentence in a different case do not support the urged possibility of perjury by Taylor, while Aquart's trial record actually undermines that hypothesis. The same conclusion obtains with respect to Aquart's suggestion that the prosecution suborned perjury by Taylor.

To be sure, cross-examination might have been used to challenge Taylor's professed release expectation, but that does not mean the testimony was false. In any event, Aquart's counsel, who pursued many lines of impeachment, chose not to cross-examine Taylor on this matter, and we are not persuaded by the argument that

he could not meaningfully do so before learning facts pertaining to the Lopez sentence. As already noted, moments before Taylor stated that he did not think he was ever going home, he admitted that he was "hoping" for a "lesser sentence." *Id.* at 594. This, by itself, provided a basis for cross-examination to insinuate that Taylor's hope belied his professed expectation. Aquart's failure to avail himself of this opportunity is a factor further weighing against his request for a hearing to explore the possibility of falsity.

In sum, because (1) Aquart fails to demonstrate that Taylor actually testified falsely and, indeed, offers little factual support for his claim of possible perjury; (2) the trial record shows that Taylor hoped for a reduced sentence; and (3) defense counsel chose not to use cross-examination to impeach Taylor on this issue despite an adequate opportunity to do so at trial, we conclude that the interests of justice do not here require a post-conviction hearing to explore whether Taylor understated his release expectations.

### 2. Lashika Johnson

Aquart's claim of perjury by Lashika Johnson arises in the context of his appeal from the district court's denial of his motion for a new trial. *See* Fed. R. Crim. P. 33. We review the denial of a new trial motion for abuse of discretion, which we will identify only if the district court's decision rests on an error of law or clearly erroneous fact finding, or if its decision cannot be located within the permissible range available to the district court. *See United States v. Forbes*, 790 F.3d 403, 406 (2d Cir. 2015). That is not this case.

Aquart claims that on cross-examination, Lashika Johnson falsely denied being threatened by the government at an October 14, 2008 proffer session. In support, he points to her acknowledgment of such threats at the subsequent trial of her brother Efrain Johnson.[10] Judge Arterton, who presided over both trials, detailed in a written decision why she found that Lashika Johnson had not willfully given false testimony at Aquart's trial. We accord this finding considerable deference, mindful that it is informed by the unique vantage point of a trial judge who directly observed the witness testify on the two occasions at issue. *See United States v. Stewart*, 433 F.3d at 296 (observing that, in ruling on new trial motion, district court's "vantage point . . . has been informed by the trial over which it presided"). Moreover, because there is record support for the district court's finding, we identify no abuse of discretion in its denial of a new trial.

To facilitate our own discussion, we reproduce in the margin relevant excerpts from Lashika Johnson's testimony at both the

---

[10] The jury found Efrain Johnson guilty of the charged homicide crimes on a felony-murder theory, but the district court subsequently entered a judgment of acquittal, finding the evidence insufficient as a matter of law to prove that Efrain Johnson (1) knowingly and intentionally participated in Aquart's racketeering enterprise at the time of the killings, or (2) "participated as consideration for the receipt of anything of pecuniary value." *United States v. Johnson*, No. 3:06-cr-160, 2013 WL 3422016, at \*9 (D. Conn. July 8, 2013) (discussing requirements of 18 U.S.C. § 1959).

Aquart and Efrain Johnson trials.[11]  The transcripts show, as the district court recognized, that while Lashika Johnson testified at

[11] On cross-examination at Aquart's trial, Lashika Johnson testified as follows about the October 14 proffer session:

Q.  And then in that meeting [the prosecutors] confronted you, did they not?

A.  About?

Q.  They said that we don't think that you are telling us the truth.

A.  Yeah.

Q.  Now, you understood that at that point that if the law enforcement people didn't believe you, you were in big trouble.

A.  Yeah.

Q.  And they were telling you they didn't believe you, right?

A.  Yes.

Q.  And then you started crying?

A.  Uh-huh (indicating affirmatively).

Q.  And you understood, however, that if they didn't believe you, your proffer was gone, right?

A.  Right.

Q.  You could be prosecuted, right?

A.  Right. . . .

Q.  Well, you now said that your brother had admitted tying people up, right?

A.  Right.

Q.  Because you were being threatened, right?

A.  Not because I was being threatened.

Q.  You were being threatened, were you not?

A. I don't think it was a threat. It was just more so like they were telling me what was right and what I had to do.

Q. And you understood that if you didn't do what they said, you were in big trouble.

A. I understood that if I didn't do what was right then I would be in trouble.

Gov't App'x 736–37.

At the subsequent trial of Efrain Johnson, Lashika Johnson testified on cross-examination about the same proffer session as follows:

Q. Do you remember a meeting around this time when you first started meeting with the government where you kind of broke down crying?

A. Yes. . . .

Q. And am I correct at that meeting that [the prosecutor] yelled at you?

A. Yes.

Q. And she stood up and threatened to put you in shackles?

A. Yes.

Q. She said if you didn't start saying what they wanted to hear they were going to take you off to jail?

A. She didn't put it in exactly those words.

Q. She threatened you'd be going to jail?

A. Yes.

Q. That you were going to lose your children?

A. Yes.

Q. How did that make you feel?

A. It didn't feel too good.

Q. Scared?

A. Yes.

43

Aquart's trial "that she did not regard the Government's warning about the consequences of lying as a threat," at her brother's trial, "she agreed with defense counsel's characterization that the AUSA threatened to put her in shackles, send her to jail, and take away her children." Appellant App'x 551. At the same time, however, the transcripts support the district court's observation that Lashika Johnson's testimony at both trials was "consistent as to its inculpatory substance." *Id.* at 552. And more to the point of Aquart's perjury claim, Lashika Johnson's testimony consistently connected her

---

*Id.* at 1726.

Then, in response to leading questions on redirect, Lashika Johnson acknowledged that her attorney was present throughout this proffer session and that she spoke to him privately before providing more information to prosecutors. *See id.* at 1728. She further acknowledged that there was nothing the prosecutor "or anyone [else] could say," nor "any fear about [her] children that would make [her] lie about [her] own brother." *Id.*

On re-cross, also in response to leading questions, she agreed that the prosecutor was not hesitant to "yell" at her, or to "say if you don't do this we're going to send you to jail and take away your kids," or to "ma[k]e clear that she was going to have . . . agents who were present take [her] out of th[e] room right then and take [her] to jail." *Id.* at 1729.

Finally, on re-redirect, Lashika Johnson gave the following testimony:

> Q. Have you been threatened to say anything?
>
> A. No.
>
> Q. Had you ever been told you'd better say something bad about your brother or anything else?
>
> A. No.
>
> Q. Are you telling us about your brother because it's the truth or because you've been threatened?
>
> A. Because it's the truth.

*Id.* at 1730.

disclosure of additional inculpatory information to government action reducing her to tears.  To the extent she particularized this government action at her brother's trial and did not do so at Aquart's, the record shows that was a function of the more pointed, leading questions asked by Efrain Johnson's attorney, which expressly referenced shackling and the loss of children—matters not raised by Aquart's counsel.[12]

Nevertheless, at both trials, Lashika Johnson testified that she made a fully inculpatory disclosure as to her brother only after the government challenged her veracity in a tearful confrontation. Indeed, even at Aquart's trial, Lashika Johnson stated that she understood the prosecution's disbelief of her initial proffer to mean that she would be prosecuted.  Thus, because Lashika Johnson's responses at both trials made clear that her testimony was a product of government pressure, we cannot identify clear error in the district court's determination that the witness did not willfully lie in declining to adopt the same "threat" characterization at Aquart's trial that she adopted at her brother's.

Moreover, even in accepting the threat characterization at her brother's trial, Lashika Johnson testified that she had never been threatened to make particular statements, that her trial testimony was not informed by any threats, and that neither anything said by prosecutors nor any fear for her children would make her lie.  On this record, we conclude that the district court, after having itself heard

---

[12] The prosecution denies threatening to shackle the witness or to take away her children, but we need not resolve that factual dispute to decide this appeal.

Lashika Johnson testify at both trials, did not clearly err in finding that Aquart had not shown her to have willfully testified falsely at his trial and, thus, did not abuse its discretion in denying him a new trial.

We therefore reject both of Aquart's perjury challenges to his conviction.

### C.    Prosecutorial Misconduct in Summation

Aquart argues that he was denied a fair trial by the prosecution's interjection of facts not in evidence in its rebuttal summation at the guilt phase of trial.  The district court rejected this argument in denying Aquart's post-verdict motion for a mistrial.  We review such a denial for abuse of discretion, *see United States v. Deandrade*, 600 F.3d 115, 118 (2d Cir. 2010), which is not evident here because, like the district court, we identify no prosecutorial misconduct at this stage of the proceedings.

To secure relief from conviction based on prosecutorial misconduct, a defendant must show that the misconduct resulted in "substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (internal quotation marks omitted); *see United States v. Whitten*, 610 F.3d 168, 202 (2d Cir. 2010). In assessing substantial prejudice, we consider "[1] the seriousness of the misconduct, [2] the measures adopted by the trial court to cure the misconduct, and [3] the certainty of conviction absent the improper statements." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (internal quotation marks omitted).  It is a "rare case" in which we

will identify a prosecutor's summation comments, even if objectionable, as so prejudicial as to warrant relief from conviction. *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992) (internal quotation marks omitted); *see United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004). The law recognizes that "summations—and particularly rebuttal summations—are not detached exposition[s] with every word carefully constructed . . . before the event. Precisely because such arguments frequently require improvisation, courts will not lightly infer that every remark is intended to carry its most dangerous meaning." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (alterations in original) (internal citations and quotation marks omitted); *see United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) ("[T]he Government has broad latitude in the inferences it may reasonably suggest to the jury during summation." (internal quotation marks omitted)).

The rebuttal comments at issue here responded to a defense argument impugning the government's DNA identifications for, among other things, focusing on suspects such as Aquart while failing to compare crime scene samples with the known DNA profile of other enterprise confederates such as cooperator Rodney Womble. Specifically, defense counsel argued,

> We're not asking you to conclude that [Connecticut forensic examiner Christine] Roy manipulated data or consciously forced anyone to fit or not fit inside of a profile. But observer bias, the problem that an interpretation is driven by or colored by knowing who you are comparing the samples to; it exists. She had

47

> evidence in the form of an evidence request with the suspect's name on it, Azibo Aquart. And Rodney Womble, we don't know what happened with Womble, but we know by the time the testing began he was cooperating and his DNA profile was never provided to the lab.

Gov't App'x 1071.

The government attempted to rebut the argument that Womble's DNA was not submitted for testing by reference to the CODIS comparisons in the case:[13]

> Well, first of all, you know Womble is a convicted felon, and you know from Christine Roy that Womble—excuse me, that the CODIS database is made up of the DNA of convicted felons. And, in fact, you know that's how they originally got the hit on Efrain Johnson and proved that he, too, was part of these murders.
>
> . . .
>
> There is absolute[ly] no evidence in this record whatsoever to suggest that Womble's DNA was at that crime scene. That, too, is telling. As telling as the fact that on cross-examination the defense never asked Womble a word about whether or not he was involved in this murder.

*Id.* at 1082–83.

---

[13] The Combined DNA Index System ("CODIS") is a DNA profile database maintained by the FBI.

The government is afforded some latitude in responding to arguments made by the defense. *See United States v. Farhane*, 634 F.3d at 167–68. Aquart argues that these statements went beyond fair response because they gave the jury the misimpression that "all" DNA samples retrieved from the scene of the charged murders were submitted to CODIS for comparison. Appellant's Reply Br. 67. We are not persuaded.

As the district court observed in denying Aquart's mistrial motion, and as the record confirms, the government's first three quoted statements referenced "facts in evidence." Gov't App'x 1550. Certainly, Womble testified to his prior conviction. As to CODIS, Roy testified that it is "a DNA profile database. . . run by the FBI," and accessible by "state accredited laboratories," "that contains DNA profiles from convicted offenders" and various crime scenes, as well as trace examiners. *Id.* at 778, 792, 801–02.[14] She did not testify to the specific number of crime scene samples sent to CODIS for comparison in this case. Rather, she testified that on one DNA sample that her lab retrieved from a latex glove fragment at the murder scene, CODIS identified Efrain Johnson's DNA profile. On another sample, it identified only the DNA of a Connecticut state trace examiner. Regardless of the number of DNA samples sent for CODIS comparison in this case, this testimony provided a good faith factual basis for the government to challenge the defense suggestion that it had deliberately failed to consider Rodney Womble in any of its DNA

---

[14] At defense counsel's request, the district court instructed the jury that the CODIS database was available only to law enforcement authorities.

49

testing. Roy's testimony would admit an inference that the CODIS comparisons performed in this case would necessarily include the known profile of a convicted felon such as Womble. Further, because the government did not argue that any particular number of samples was sent for CODIS comparison, and because Roy testified to her own state laboratory's DNA identifications on certain samples and to CODIS identification on only two others, we do not think the government unfairly insinuated that CODIS testing had been performed on all samples. *See United States v. Farhane*, 634 F.3d at 167 (declining to infer that summation comments carry "most dangerous meaning" (internal quotation marks omitted)). In short, we identify no misconduct.

The next two sentences warrant no different conclusion. Although a prosecutor certainly cannot shift the burden of proof to a defendant, *see United States v. Fell*, 531 F.3d 197, 221 (2d Cir. 2008), he can argue the lack of trial evidence to support an argument urged by the defense, *see United States v. Salameh*, 152 F.3d 88, 136 (2d Cir. 1998). Thus, to the extent the defense faulted the government for failing to compare Womble's known DNA to retrieved samples, the government was entitled to point out that no trial evidence, testimonial or forensic, had been adduced that put Womble (and, therefore, his DNA) at the scene of the charged murders. *See id.* ("The government is free to comment on the failure of defendant to refute government evidence or to support his own claims." (internal quotation marks omitted)). It was, of course, for the jury to determine the persuasiveness of this argument in light of the evidence it had

50

heard and the inferences the defense urged it to draw. We conclude only that the government's rebuttal summation did not impermissibly suggest that all DNA samples retrieved from the crime scene had in fact been submitted for CODIS comparison.

Because Aquart thus fails to show any government misconduct in summation, much less conduct that denied him a fair trial, we conclude that the district court acted within its discretion in denying him a mistrial.

In sum, we identify no merit in any of Aquart's challenges to the guilt phase of his trial and, therefore, conclude that he stands properly convicted on all counts the jury found proved in this case.

## II.    <u>Sentencing Challenges</u>

Aquart challenges his capital sentence on numerous grounds falling into three categories: (1) repeated prosecutorial misconduct in response to mitigating hearsay evidence from Efrain Johnson, (2) insufficient proof of certain aggravating factors, and (3) the unconstitutionality of the death penalty. We reject Aquart's sufficiency and constitutionality challenges, but we conclude that two prosecutorial errors in response to the Efrain Johnson evidence, considered together, require vacatur and remand for a new sentencing hearing.

## A. Standard for Reviewing Unpreserved Sentencing Challenges

Before addressing Aquart's particular sentencing challenges, we consider the parties' dispute as to how we should review urged errors to which no objection was raised in the district court. We generally review unpreserved challenges, including sentencing challenges, only for plain error. *See United States v. Marcus*, 560 U.S. at 262 (stating standard); *United States v. Rubin*, 743 F.3d 31, 39 (2d Cir. 2014). Aquart argues that the rule should not apply to capital sentencing proceedings. In support, he cites 18 U.S.C. § 3595(c)(2), which states as follows:

Whenever the court of appeals finds that—

(A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

(C) the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure,

the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death. The court of appeals shall not reverse or vacate a

sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.

Aquart submits that, by referencing proper preservation only in subpart (C), Congress signaled that the review of capital sentences under other subparts, specifically, subpart (A) review for "arbitrary factors," must "cover some situations beyond properly preserved non-harmless error and plain error affecting substantial rights." Appellant's Supp. Br. 9/19/2016, 2.

The Supreme Court construed the relevant statutory language in *Jones v. United States*, 527 U.S. 373 (1999). The defendant there argued that his capital sentence was imposed under the influence of an "arbitrary factor," specifically, jury confusion as to sentencing arising from allegedly erroneous jury instructions, which "warrant[ed] resentencing even if he did not properly preserve the objection." *Id.* at 388. In rejecting the argument, the Supreme Court held that "[t]he statute does not explicitly announce an exception to plain-error review, and a congressional intent to create such an exception cannot be inferred from the overall scheme." *Id.* at 388–89. The Court construed the preservation language in subpart (C) to "make[] clear that Congress sought to impose a timely objection requirement at [a capital] sentencing and did not intend to equate the phrase 'arbitrary factor' with legal error." *Id.* at 389 (observing that contrary "interpretation of § 3595(c)(2)(A) would drain § 3595(c)(2)(C) of any independent meaning"). Thus, *Jones* instructs that a capital defendant cannot simply recast unpreserved legal error

53

as an arbitrary factor (or as the trigger for an arbitrary factor) to avoid plain error review. *See United States v. Whitten*, 610 F.3d at 190 (applying plain error review to unpreserved objection to "emotionally charged" victim impact statements at capital sentencing proceeding).

In arguing that he is not doing so here, Aquart submits that his sentencing challenges—particularly prosecutorial vouching and Sixth Amendment errors regarding the Efrain Johnson evidence—are distinguishable from the jury confusion/erroneous instruction error raised in *Jones*. In support, he cites *State v. Butler*, 277 S.C. 543, 546, 290 S.E.2d 420, 421 (1982) (characterizing prosecutorial vouching as "arbitrary factor" under parallel provision of state death penalty law), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991). The difference is not one that allows Aquart to avoid *Jones*'s holding. Prosecutorial vouching is recognized as a claim of legal error that, if not preserved, is properly reviewed for plain error. *See United States v. Williams*, 690 F.3d 70, 75–76 (2d Cir. 2012) (reviewing unpreserved vouching claim for plain error in non-capital case); *United States v. Martinez*, 862 F.3d 223, 241–42 (2d Cir. 2017) (recognizing vouching claim to implicate due process right to fair trial), *cert. petition filed sub nom. Rodriguez v. United States*, 18-5234 (July 13, 2018). Further, following *Jones*, this court has applied plain error review to unpreserved claims of precisely the sort Aquart presents here, *i.e.*, due process challenges to prosecution statements made in the course of a capital sentencing proceeding. *See United States v. Fell*, 531 F.3d at 209, 209 n.8, 220–21; *see also United States v. Rodriguez*, 581

54

F.3d 775, 802–03 (8th Cir. 2009) (reviewing for plain error unpreserved challenges to government summation disparaging capital defendant's case). The point warrants no further discussion, however, because Aquart's vouching and Sixth Amendment challenges were preserved by timely objections. *See infra*, Discussion Sections II.B.1. & 3. Thus, we review those sentencing arguments *de novo*.

Insofar as Aquart presents other, unpreserved sentencing challenges, however, *see, e.g., infra* at 69 (unpreserved challenge to form of questions), *see also* Discussion Section II.B.2. (unpreserved challenge to plea allocution questions), we review for plain error even in this capital context.

## B.    Prosecutorial Misconduct Pertaining to Efrain Johnson Evidence

Aquart asserts various instances of prosecutorial misconduct in response to evidence pertaining to confederate Efrain Johnson. Certain challenged government conduct reflects no misconduct, but when we consider two errors—one in the cross-examination of FBI Agent Christopher Munger and the other in summation—together and in context, *see United States v. Fell*, 531 F.3d at 233, we cannot confidently conclude that the jury would have returned a death verdict absent these errors. Accordingly, we vacate Aquart's capital sentence and remand for a new penalty proceeding. To explain that conclusion, we start by reiterating the nature of the Efrain Johnson evidence and the purpose for which the defense used it.

At the penalty phase of trial, Aquart called FBI Agent Munger to testify to certain statements made by Efrain Johnson at law-enforcement interviews and proffer sessions. As detailed *supra* Background Section II.B., in these statements, Efrain Johnson assigned prosecution witness Taylor a larger role in the charged murders than Taylor himself had admitted in his guilt-phase testimony. While Taylor had testified that it was the Aquart brothers who had duct taped and beaten Tina Johnson and Reid in a bedroom while Taylor himself stood guard in the living room, Efrain Johnson had told authorities that it was he and Taylor who had duct taped Tina Johnson in the living room, and that Taylor had there beaten Tina Johnson with a metal pipe, soon after which Efrain Johnson left the apartment.

Because the jury had already found Aquart guilty of Tina Johnson's murder, the defense could not use Efrain Johnson's hearsay statements to relitigate that question. Instead, it proposed to use the statements to dispute the confederates' relative roles in the proved murders, which it submitted was relevant both to the government's aggravating factor charging Aquart with having personally committed the Tina Johnson and Reid murders in a heinous and depraved manner, as well as to the defense's urged mitigating factor that equally culpable participants in those crimes were not facing the death penalty. *See* App'x 481–82 (urging both grounds in moving for receipt of statements); *see also* Gov't App'x 1406-09. Over vigorous prosecution objection, the district court ruled that Aquart could offer the Efrain Johnson statements for these two purposes.

56

At the actual penalty proceeding, however, Aquart used the statements only to argue for mitigation. *See* Gov't App'x 1465 (arguing in summation that Efrain Johnson's statements should not "in any way . . . shake your conclusion about [Aquart's] guilt for these murders"; rather, statements "matter[ed]" because "fact that others were also involved in the offense and will not receive a death sentence is something that you can and should consider in deciding on the punishment"). Indeed, in a colloquy with the court, Aquart's counsel specifically disavowed challenging any government aggravating factor. *See id.* 1467–68 (stating in rebuttal colloquy that defense had "not in any sense attack[ed] or challenge[d] any of the aggravators alleged by the government in this case").[15]

With this understanding of how Aquart used the Efrain Johnson evidence, we proceed to consider his claim of repeated government misconduct taking three forms: (1) negative vouching as to Efrain Johnson's credibility, (2) mischaracterizion of Johnson's plea allocution, and (3) summation denigration of the defense for urging inconsistent theories at the guilt and penalty phases of trial. We evaluate Aquart's argument first by identifying what prosecutorial actions, in fact, amount to misconduct. We then consider the seriousness of that misconduct, the curative measures adopted by the district court in response, and the certainty of a death sentence absent

---

[15] We do not fault defense counsel's disavowal of aggravator challenges. Nor do we suggest that counsel's disavowal relieved the government of its burden to prove aggravating factors beyond a reasonable doubt—a burden the jury ultimately found it to have carried as to each factor. Rather, we cite counsel's disavowal only to show how the Efrain Johnson statements were used by the defense at the penalty proceeding.

any error. *See generally United States v. Banki*, 685 F.3d at 120. On such review, we conclude that even though many of the challenged government actions, standing alone, do not manifest misconduct, a cross-examination error and a rebuttal error, considered together, may have denied Aquart a fair penalty proceeding.

### 1. Improper Vouching

Aquart charges the government with "blatant and impermissible vouching" when, in cross-examining Agent Munger, it referenced Efrain Johnson's failure to reach a cooperation agreement with the government. Aquart maintains that such references "plainly invited jurors to treat Taylor's account as truthful and Efrain [Johnson]'s as false *because the government . . . had formally deemed them so*." Appellant's Br. 77 (emphasis added). The challenged cross-examination, which we reproduce in the margin, is in two parts, the

58

first pertaining to Efrain Johnson's proffer sessions,[16] the second pertaining to his failed guilty plea.[17] We discuss each in turn.

---

[16] The proffer-session exchange reads as follows:

> Q. [Prosecutor] Can you please explain to the jury what a proffer is.
>
> A. [Agent Munger] A proffer is when somebody comes in . . . with his attorney . . . and they basically tell their side of the story. They're supposed to tell everything, anything and everything, and tell the truth.
>
> Q. And usually the proffers, that's another word for a meeting, right?
>
> [DEFENSE COUNSEL]: I'm going to object—
>
> A. Yes.
>
> [DEFENSE COUNSEL]: —as this being outside the scope.
>
> THE COURT: The statements on which Mr. Munger was questioned were [made at] proffer sessions.
>
> THE WITNESS: Yes.
>
> THE COURT: Overruled.
>
> Q. And proffer sessions are designed to work towards a cooperation agreement, correct?
>
> A. Yes.
>
> Q. And Efrain Johnson never got a cooperation agreement, did he?
>
> A. No.
>
> Q. And that's because it was determined he was lying.
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Sustained.

Gov't App'x 1421.

## a. Proffer Session Queries

On *de novo* review, we identify a single, but significant, error in the prosecution's cross-examination of Agent Munger about Efrain Johnson's proffer sessions: the attempt to elicit that Efrain Johnson did not receive a cooperation agreement because "it was determined he was lying." Gov't App'x 1421. This inquiry ran afoul of established law holding that cross-examination cannot be used to "direct[] the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Henry*, 47 F.3d 17, 21 (2d Cir. 1995) (internal quotation marks omitted)).

Before discussing this error further, however, we note that to the extent Aquart would have us also identify misconduct in government inquiries about the purpose of a proffer session, we here conclude that such an inquiry, by itself, is not impermissible. The circumstances under which a suspect speaks to the government may reveal motives that inform credibility. That is particularly so when the suspect incriminates others as well as himself. *See Lee v. Illinois*, 476 U.S. 530, 541 (1986) (noting presumptive unreliability of hearsay confessions incriminating accomplice's confederates). Indeed,

---

[17] The guilty plea inquiry reads as follows:

> Q. [Prosecutor] . . . and that was just an attempt at a straight plea, correct, not a cooperation agreement?

> A. [Agent Munger] That is correct.

>> [DEFENSE COUNSEL]: Objection. Object as to the relevance of that. Ask that it be stricken.

Gov't App'x 1424.

Aquart effectively acknowledged the relevancy of a proffer context to an assessment of credibility because his own attorney questioned Agent Munger about whether certain persons, including Lashika Johnson, had participated in proffer sessions.

For much the same reason, we identify no misconduct in the government eliciting the simple fact that Efrain Johnson never had a cooperation agreement with the government. Parties may fail to reach cooperation agreements for any number of reasons unrelated to the government's assessment of the declarant's credibility—*e.g.*, the government may be demanding a guilty plea to a more serious charge than that to which the defendant is willing to admit, or a defendant may be seeking sentencing assurances or other considerations that the government is unwilling to provide. Here, the jury had already heard that various witnesses testified pursuant to cooperation agreements and that those agreements gave rise to motives informing credibility.[18] Thus, the fact that Efrain Johnson had not made the statements at issue pursuant to a cooperation agreement was relevant to an assessment of the credibility of those statements.

---

[18] These motives are not necessarily identical to those arising from a proffer agreement, which may assure a declarant only that his statements will not be used against him in any subsequent prosecution. *See United States v. Cruz*, 156 F.3d 366, 370 (2d Cir. 1998) (stating that defendant who entered into proffer agreement "neither obtained the benefits nor the burdens of . . . a cooperation agreement"). A cooperation agreement, by contrast, may involve more complex, mutual promises with respect to charges, sentences, and the consequences for any breaches of the agreement, including lying. *See, e.g., United States v. Doe*, 741 F.3d 359, 362 (2d Cir. 2013); *United States v. Tarbell*, 728 F.3d 122, 124–25 (2d Cir. 2013).

Had the government stopped there, Aquart could not complain of misconduct. That, however, was not the extent of the government's inquiry. It proceeded to ask Agent Munger to confirm that the reason Efrain Johnson never had a cooperation agreement was the government's determination that "he was lying." Gov't App'x 1421. Thus, we consider the challenged questioning in light of its culmination in this improper inquiry. The concern here is not simply with the use of the word "lying," as the government suggests in citing *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002) (rejecting challenge to government's use of word "lies" because not excessive or inflammatory). The concern is the law's insistence that witness credibility be left "exclusively for . . . determination by the jury." *United States v. Truman*, 688 F.3d 129, 143 (2d Cir. 2012) (internal quotation marks omitted) (holding that "witnesses may not opine as to the credibility of the testimony of other witnesses at the trial" (internal quotation marks omitted)). Efrain Johnson's proffer statements were received as the equivalent of witness testimony. Asking Agent Munger whether law enforcement authorities had already determined that Efrain Johnson was lying in those statements impermissibly intruded on the jury's exclusive responsibility for determining credibility. *See United States v. Henry*, 47 F.3d at 21.

The identification of such misconduct, however, is only a first step. We must consider that misconduct in context to determine whether the error was so serious and prejudicial as to compel a new penalty proceeding. *See generally Greer v. Miller*, 483 U.S. 756, 756–66 (1987) (observing that when defendant contends that prosecutor's

62

question rendered trial fundamentally unfair, "it is important as an initial matter to place the remark in context" (alterations and internal quotation marks omitted)).[19]

That context includes any curative actions taken by the district court. Here, the district court promptly sustained objection to the challenged question before it was answered. That alone would not sufficiently mitigate the seriousness of the prosecution's error because the question was leading and implied its own answer. That concern, however, was addressed by the district court's earlier instructions, advising the jury that questions asked of witnesses were "not evidence," and that a question to which an objection was sustained should be "ignore[d]." Gov't App'x 4, 1050. The court had also instructed the jury that nothing said by counsel was evidence, and that witness credibility had to be determined by the jury. Such instructions together with a sustained objection are generally a sufficient cure for "any potential bias posed by the questions." *United States v. McCarthy*, 54 F.3d 51, 56 (2d Cir. 1995). We presume that juries follow such instructions, *see, e.g.*, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *United States v. Stewart*, 433 F.3d at 306–07, and this case warrants no exception, *cf. Kansas v. Carr*, 136 S. Ct. 633, 645 (2016) (recognizing "narrow departure" from presumption where

---

[19] Because the second-step inquiry is necessary to decide if the identified vouching error denied Aquart a fair trial, our ensuing discussion and negative conclusion are holdings, notwithstanding the views of our concurring colleague. *See* Concurring Op., *post* at 2. While the vouching error does not stand alone, *see infra* Discussion Part II.B.3., our conclusion that it did not, by itself, deny Aquart a fair trial is necessary to understand why only the identification of further error prompts vacatur and remand.

improperly presented evidence is so inculpatory as to be "ineradicable, as a practical matter, from the jury's mind").[20]

Nor is a different conclusion compelled by the fact that the relevant instructions were given generally rather than in specific response to the sustained objection. While pinpoint curative instructions may be particularly effective in safeguarding against prejudice, *see United States v. Thomas*, 377 F.3d 232, 245 (2d Cir. 2004), they are not invariably required, *see United States v. Elias*, 285 F.3d at 192 (recognizing pattern instruction as sufficient safeguard against prejudice, particularly where misconduct not severe).[21] There is no reason to have required them here where the general instructions specifically addressed the matter at issue, *cf. United States v. Friedman*, 909 F.2d 705, 709–10 (2d Cir. 1990) (holding that court's statement to jury—"I don't think that is appropriate"—after sustaining objection, provided only modest response to error that, in context, was

---

[20] In *Kansas v. Carr*, the "ineradicable" evidence was "a codefendant's confession implicating the defendant" in violation of the Confrontation Clause and the rule stated in *Bruton v. United States*, 391 U.S. 123 (1968). *See Kansas v. Carr*, 136 S. Ct. at 645. The Supreme Court, however, has itself "declined to extend that exception" beyond *Bruton* error. *Id.* (ruling that exception did not apply to defendants at joint capital-sentencing proceeding, who argued that some evidence presented by each defendant was prejudicial to other); *Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (holding codefendant's confession that "was not incriminating on its face," but "became so only when linked with evidence introduced later at trial," to "fall outside" narrow *Bruton* exception).

[21] *United States v. Modica*, 663 F.2d 1173 (2d Cir. 1981), is not to the contrary because this court there held pattern jury instructions an insufficient response to prosecutorial misconduct where the district court had "overruled" objection, thus suggesting that the instruction did not pertain to the conduct at issue. 663 F.2d at 1178–82. By contrast, here, the district court sustained objection, bringing the government's unanswered question clearly within the instruction to ignore such questions.

"insufficient" to preclude "significant risk of prejudice"), and Aquart did not ask the court to repeat or supplement those instructions, *see Greer v. Miller*, 483 U.S. at 766 n.8 (observing, in response to argument that trial court's "curative instructions should have been more specific," that "trial counsel b[ears] primary responsibility for ensuring that the error was cured in the manner most advantageous to his client"). As this court has observed, in the absence of such a request, a trial court may well think "that a more emphatic instruction would have the unwanted effect of focusing the jury's attention on the improper remark." *United States v. Melendez*, 57 F.3d 238, 242 (2d Cir. 1995). Thus, while we will overlook a defense counsel's failure to request specific curative instructions where the prosecutor's misconduct "is so prejudicial that no instruction could mitigate its effects," "in less egregious cases" where a curative instruction can forestall prejudice, "the failure to request specific instructions before the jury retires will limit the defense's ability to complain about the relative lack of curative measures for the first time on appeal." *Id.*[22] This does not necessarily end judicial inquiry into the severity and prejudice of the prosecutor's conduct. *See generally United States v. Friedman*, 909 F.2d at 710 (observing that claims of prosecutorial misconduct "must be carefully assessessed as to [each case's]

---

[22] The misconduct in *Melendez,* a prosecutor's summation pronouncement that the trial judge "knows" a government's cooperating witness "is telling the truth," *United States v. Melendez*, 57 F.3d at 240, can be considered more serious than that here at issue, *see id.* at 241 (observing that "jury is more likely to be influenced when an evaluation of the facts receives the imprimatur of an impartial trial judge, rather than a prosecutor, whom the jury recognizes to be an advocate"), but, nevertheless, was deemed capable of mitigation through appropriate instruction, *see id.* at 242.

individual circumstances"). But where, as here, the defense neither sought further instructions nor moved for a mistrial after objection to the vouching question was sustained, that is "some indication" that the defense itself did not perceive the improper question "as rendering the trial unfair" in light of the instructions given and the sustained objection. *United States v. Melendez,* 57 F.3d at 243.

The government's ensuing conduct provides further context for us to assess the vouching error and to conclude that—by itself—the error did not deny Aquart a fair sentencing hearing. After the district court sustained objection, the government largely, and properly, focused its cross-examination on showing the jury exactly how Efrain Johnson's proffer statements evolved, how lies and internal inconsistencies were exposed, and how discrepancies with physical and forensic evidence persisted. This mitigated one of the principle concerns with vouching, *i.e.,* that it "impl[ies] the existence of extraneous proof," available to the government but not to the jury, which gives the former an advantage in assessing credibility. *United States v. Perez,* 144 F.3d 204, 210 (2d Cir. 1998) (internal quotation marks omitted); *accord United States v. Williams,* 690 F.3d at 76 (observing that statements "vouching for the credibility of witnesses are generally improper because they imply the existence of evidence not placed before the jury" (internal quotation marks omitted)).

Thus, the jury heard that when Efrain Johnson first spoke with government authorities on March 6, 2007, he denied any involvement in the murders at issue and stated that he had not been in the Charles Street building for the previous eight or nine years. The falsity of the

latter statement was established by the recovery of Efrain Johnson's DNA from the crime scene. Confronted with that evidence, Efrain Johnson changed course and admitted being inside the building but denied participating in any crimes. Rather, he stated that "Dreddy" (Aquart) had told him to knock on an apartment door and to see if the occupants would sell him drugs. When a woman answered, Efrain Johnson spit in her face but then left the scene. This too was a lie because Efrain Johnson's DNA was specifically identified on a latex glove fragment stuck in duct tape binding one of the murder victims. Confronted with that fact, Efrain Johnson gave his third account of the day. He stated that he had gone to 215 Charles Street in the middle of the night with Aquart, Azikiwe Aquart, and "Big Dude" (Taylor). There, Efrain Johnson knocked on an apartment door and when a woman (Tina Johnson) answered, all four men rushed into the apartment, with Taylor pushing the woman back into the living room. Aquart and his brother then went down the hallway and pushed a man into a back bedroom.

The jury further heard that in a November 20, 2008 proffer, Efrain Johnson gave a still different account of the initial entry into the apartment, stating that he was the first person to enter the premises and the first to touch Tina Johnson, pushing her down when he tripped over her. Moreover, Agent Munger testified that Efrain Johnson—who stated that he restrained Tina Johnson on Taylor's orders and then saw Taylor beat Tina Johnson with a pipe—could not identify Taylor in either of two photo arrays shown to him, one on November 20, 2008, and the other on May 4, 2009.

The jury also learned from Agent Munger that, while Efrain Johnson had stated that Tina Johnson was restrained and beaten in the living room, he gave different accounts of where in the living room the assault had occurred. On March 6, 2007, he stated that Tina Johnson was on the living room floor when attacked. On March 7, 2007, he said she was leaning over a bed. After Agent Munger told Efrain Johnson that there was no bed in the living room, he altered his account from bed to sofa bed. But, as Agent Munger told the jury, there was no sofa bed anywhere in Apartment 101.

Agent Munger further put before the jury discrepancies in Efrain Johnson's account of how long he was at the murder scene. On March 7, 2007, he admitted being in the apartment for 25 minutes. On August 11, 2008, he said he was there only eight minutes. On October 2, 2008, he stated that the entire attack had taken 30 to 45 minutes, for 15 to 20 minutes of which he was waiting in a car.

The agent also testified that Efrain Johnson told authorities he never saw any masks worn or baseball bats used during the murders, and the only weapon he saw was the ten-inch long pipe that Taylor used to hit Tina Johnson. The jury, however, had already heard Lashika Johnson testify that, sometime before his arrest, Efrain Johnson had told her that the murder participants had disposed of the gloves, *bats*, and *masks* used in the crime before coming to her apartment early on the morning of August 24, 2005. *See supra*, Background Section I.A.2.f.(i). The jury had also heard various witnesses testify that Tina Johnson's and Reid's dead bodies were found in a bedroom, and that their blood was spattered throughout

68

that room.  Specifically, the jury had heard expert witness Tom Martin testify that particularly large blood spatters on the bedroom's nine-foot high ceiling indicated that the victims were struck in that room many times and with great force by a sufficiently long object with enough surface area that, when raised upward, could propel large amounts of blood onto the ceiling.  Martin agreed that a baseball "bat would fit that description."  Gov't App'x 1181.

By thus showing the jury exactly how Efrain Johnson had lied in his proffer sessions, and how his statements were internally inconsistent and at odds with physical and forensic evidence, the government significantly minimized the potential for prejudice from its objectionable attempt to elicit its own adverse assessment of his credibility.

Nor is a different conclusion compelled by the government's eliciting its admissible evidence through questions sometimes framed in terms of what Efrain Johnson "claimed" or what he "did not admit."  Gov't App'x 1421–24, 1427.  Aquart argues that such formulations impermissibly insinuated the prosecutor's own disbelief and, thus, involved further vouching.  The argument is undermined by the absence of objection to a single one of these questions, which "strongly indicates" that the defense "did not understand the statements to communicate impermissible vouching."  *United States v. Newton*, 369 F.3d at 682.  This is not surprising.  Referring to what a declarant "claimed" or highlighting what he "did not admit" may well signal to a jury that a witness's account should be carefully scrutinized, but it does not communicate the prosecutor's own

69

disbelief, nor does it attempt to substitute that disbelief for the jury's own assessment of the evidence. Accordingly, we identify no error, let alone plain error, in the framing of these unobjected-to questions.

In sum, when we consider the government's vouching error in light of both the district court's curative actions and the record as subsequently developed by the government, we conclude that this error, by itself, would not warrant vacatur of sentence and remand. We reach a different conclusion only when we consider this misconduct together with subsequent rebuttal error discussed *infra* at Discussion Section II.B.3.

#### b. <u>Plea Allocution Queries</u>

Before addressing the rebuttal error, however, we consider Aquart's challenges to other, intervening prosecutorial actions pertaining to the Efrain Johnson evidence. The first involves further cross-examination of Agent Munger, this time about Efrain Johnson's statements at an attempted plea allocution.[23] The prosecutor asked Munger to confirm that the allocution "was just an attempt at a straight plea . . . not a cooperation agreement," to which Agent Munger answered "[t]hat is correct." Gov't App'x 1424. Aquart asserts that this objected-to inquiry repeated and, thereby, aggravated the earlier vouching error. On *de novo* review, we deem the argument unconvincing for several reasons.

---

[23] The relevant testimony is reproduced *infra* at nn. 24–25.

70

First, viewed by itself, the question sought to elicit only that Efrain Johnson did not attempt to plead guilty pursuant to a cooperation agreement; it did not inquire as to the reason for that fact. We have already explained *supra*, Discussion Section II.B.1.a., why a simple inquiry into whether a declarant did or did not have a cooperation agreement with the government at the time he made certain statements does not constitute vouching. To the contrary, it elicits a fact relevant to the jury's assessment of credibility. To explain, in the allocution statements at issue, Efrain Johnson appeared to implicate Aquart in the initial duct taping of Tina Johnson, while making no mention of Taylor, as in Efrain Johnson's earlier proffer statements. If the plea allocution had been pursuant to a cooperation agreement, Aquart might well have urged that the agreement provided Efrain Johnson with a motive to curry favor with the prosecution, which he was doing by assigning the taping role to Aquart. The fact that Efrain Johnson had no agreement was thus relevant to a jury's credibility assessment of the statement, as the district court appears to have recognized in initially overruling Aquart's relevancy objection.

Second, even when the challenged allocution inquiry is viewed in light of the earlier vouching error, there was no risk of prejudice because the government was not here insinuating that it disbelieved Efrain Johnson's allocution statement inculpating Aquart. To the contrary, it elicited the lack of a cooperation agreement to suggest that the jury could deem the statement credible because Johnson had not aligned himself with the government.

71

Third, even if the allocution inquiry risked any prejudice—which we do not think it did—that was mitigated by the district court's ultimate decision to sustain objection and to strike both the question and the answer. Here, as before, we presume the jury followed the court's instruction to ignore struck questions and answers. *See United States v. Stewart*, 433 F.3d at 307.

Aquart nevertheless complains that the district court's accompanying curative instruction was opaque and insufficient. We are not persuaded. After telling the jury that it was striking the objected-to question and answer about the lack of a cooperation agreement, the district court told the jury that it was "to understand that discussion to have been with respect to a proceeding in which Efrain Johnson attempted to enter a guilty plea." Gov't App'x 1427. In context, "that discussion" is reasonably understood to refer to the discussion still in evidence, wherein, as Agent Munger confirmed, Efrain Johnson made statements implicating Aquart. The district court's instruction made certain that the jury understood that the context for those statements was "a proceeding in which Efrain Johnson attempted to enter a guilty plea." *Id.* Although Aquart now argues that the district court should have given clearer or additional instructions, his failure to seek either limits his ability to complain on appeal. *See Greer v. Miller*, 483 U.S. at 766 n.8; *United States v. Melendez*, 57 F.3d at 242.

In sum, we conclude that the stricken question and answer about Efrain Johnson allocuting without a cooperation agreement,

72

whether considered alone or together with the earlier impermissible vouching inquiry, did not deny Aquart a fair penalty proceeding.

## 2. Misleading Characterization of Plea Allocution

Aquart next argues that the government denied him a fair penalty proceeding by mischaracterizing Efrain Johnson's plea allocution to suggest that he there recanted his proffer assertions that it was he and Taylor who had taped Tina Johnson. We reproduce in the margin the relevant portions both of Efrain Johnson's allocution[24]

---

[24] The following colloquy took place at Efrain Johnson's attempted guilty plea:

THE COURT: All right, please tell me what it is that you did that shows that you are in fact guilty of the charges in Counts One, Two and Three to which you are offering to plead guilty.

THE DEFENDANT [Efrain Johnson]: I helped someone—Dreddy [Aquart]—gain access to someone's house, and I taped the person up. And that's it.

THE COURT: Okay, we're going to be a little more specific. Can you tell me the time frame[?]

THE DEFENDANT: August 24th.

THE COURT: And you helped someone. Who is the someone?

THE DEFENDANT: Dreddy. Azibo.

THE COURT: And you helped him do what?

THE DEFENDANT: Tape Tina Johnson up, and I drove him from the scene.

THE COURT: Now, you are charged in Count One with assisting one of the co-defendants to commit the murder of Tina Johnson and in Count Two James Reid and in Count Three Basil Williams. I haven't heard anything more than about Tina Johnson.

73

and of the government's cross-examination of Agent Munger on that topic.[25]

---

THE DEFENDANT:   I drove Azibo to Tina Johnson's apartment.  When I got there, I put on gloves, I helped him gain entry by knocking on the door, and when they went in there, I helped him tape her up, and then I drove him away from there, Azibo.

Gov't App'x 1738–39.

[25] The following exchange took place on cross-examination of Agent Munger:

Q.   [Prosecutor] Were you here in this court when [Efrain] Johnson came in here to plead guilty?

A.   [Agent Munger] Yes, I was.

Q.   And during that plea, he had to tell the court under oath what he did wrong, correct?

A.   Yes.

Q.    And isn't it true that during that . . . sworn statement, that Johnson said, "I helped Dreddy gain access to someone's house and I taped the person up and that's it"?  Did you hear him say that?

A.   I heard him say that.

Q.   And . . . then the Court asked, "And you helped someone.  Who is the someone?"  And Johnson replied "Azibo."  Did you hear that?

A.   Yes.

Q.   And then the Court asked, "And you helped him do what?"  And Johnson responded, "Tape Tina Johnson up and I drove him from the scene."  Did you hear that?

A.   Yes.

Q.   So, he never said a word about Taylor having anything to do with the taping, did he?

A.   That is correct.

Gov't App'x 1424.

74

As these excerpts show, the defense's quarrel is really with the last cross-examination question and answer: "Q. So, [Efrain Johnson] never said a word [at his plea allocution] about Taylor having anything to do with the taping, did he? A. That is correct." Gov't App'x 1424. All other questions quoted accurately from the plea transcript.

Aquart argues that the exchange was misleading because it implied that, at his allocution, Efrain Johnson had been asked other, "pointed" questions about Taylor and that he "had clearly and unequivocally renounced any claim that Taylor had taped" Tina Johnson. Appellant's Br. 85. The hypothesis is undermined by Aquart's own failure to voice a contemporaneous objection. *See United States v. Newton*, 369 F.3d at 682. That omission also limits our review to plain error, which is not evident here.

Moreover, we identify no misconduct because the cross-examination question at issue cannot reasonably be understood to imply either that Efrain Johnson was asked any unquoted questions about Taylor, or that he "clearly and unequivocally renounced" his proffer statements about Taylor taping Tina Johnson. To the contrary, because the government's three immediately preceding questions quoted directly from Efrain Johnson's plea colloquy, a reasonable jury would have understood the government's final question to be a summary inquiry, asking Agent Munger to confirm what the quoted questions and answers showed: that Efrain Johnson never mentioned Taylor in his allocution discussion of taping Tina Johnson. It remained for the jury to decide whether mention of Taylor would

75

have been responsive to the quoted questions. But the government had a good faith basis in the record for asking its questions, and Aquart could have used redirect examination to eliminate any of the ambiguities he now hypothesizes.

Aquart nevertheless maintains that the government's final quoted inquiry was unfair because, at the start of Efrain Johnson's attempted allocution, the government effectively instructed him to focus his responses on the Aquart brothers. The prosecutor's statement, which identified the elements of the crimes to be admitted, reads as follows:

> For each count the elements are the same, and that's that you murdered or aided and abetted, which means assisted or helped, in the murder of another person, in this case it would be Tina Johnson, James Reid and Basil Williams; that the murder was committed while either you or *your co-defendants*—in this case it would be *Azibo Aquart* and *Azikiwe Aquart*, with whom you are charged, while they, with your knowledge, were involved in a conspiracy to sell crack cocaine, over 50 grams of crack cocaine; and the conspiracy is just an agreement between two or more people to engage in illegal behavior. So, basically you would have to know or be a part of their conspiracy to sell drugs, and that *they committed these murders with your assistance* and that you acted knowingly and intentionally.

Gov't App'x 1738 (emphasis added).

The highlighted text does indicate that Azibo and Azikiwe Aquart were the "they" being referenced by the prosecutor as the persons who committed the charged murders "with [Efrain Johnson's] assistance." Aquart could certainly have elicited this fact on redirect examination of Agent Munger and then argued therefrom that Efrain Johnson's allocution failure to mention Taylor was explained by the prosecution's focus on the Aquart brothers. Further, Aquart could have argued to the jury—as he now does on appeal—that when Efrain Johnson said that he had "helped . . . Azibo . . . [t]ape Tina Johnson up," *id.* at 1738–39, what he meant was not that Aquart himself had participated in any taping, but that it was by taping Tina Johnson that Efrain Johnson had helped Aquart to commit the murders. But Aquart did not elicit the prosecutor's statement on redirect. Nor did he make such arguments to the jury. Having foregone these available, classic adversarial means to challenge inferences urged by the prosecution from facts in evidence, he cannot now complain of prosecutorial misconduct in introducing a fact supported by the record—Efrain Johnson's allocution failure to mention Taylor—admitting more than one inference.

The record does not, after all, compel the inferences urged by Aquart. A reasonable jury might conclude that, even if the prosecutor's statement urged Efrain Johnson to focus on the Aquart brothers, it did not preclude Efrain Johnson from referencing other participants. More to the point, a jury could conclude that when Efrain Johnson said he "helped . . . Azibo . . . [t]ape Tina Johnson up," he meant that Aquart was taping Tina Johnson and he (Efrain

77

Johnson) helped. That appears to be how Judge Arterton, who conducted the allocution, understood it. *See id.* at 1407 (telling Aquart's counsel, "You are aware that [Efrain Johnson] said at his attempted . . . allocution, that he helped Mr. Aquart tape up, I think it was Tina Johnson.").[26]

We do not ourselves choose among the competing inferences that might be drawn from the fact that Efrain Johnson referenced Aquart, but made no mention of Taylor, when he admitted in his allocution to taping Tina Johnson. We conclude simply that, because these facts admit competing inferences relevant to a jury's assessment of the credibility of Efrain Johnson's proffer statements, the government did not engage in prosecutorial misconduct by eliciting them on cross-examination of Agent Munger.

### 3. Denigrating Defense Strategy

Aquart asserts that the prosecution denied him a fair penalty proceeding when, in summation, it urged the jury to reject his first mitigation factor—*i.e.*, that confederates Taylor and Efrain Johnson would not face the death penalty—because the defense's assignment of an aggravating role in the murders to Taylor was inconsistent with its guilt-phase theory that Taylor was not even present for the

---

[26] The district court's conclusion finds further support in another allocution statement by Efrain Johnson that the government did not put before Aquart's trial jury: "I drove *Azibo* to Tina Johnson's apartment. When I got there, I put on gloves, I helped *him* gain entry by knocking on the door, and when they went in there, I helped *him* tape her up, and then I drove *him* away from there, *Azibo*." Gov't App'x 1739 (emphasis added).

78

murders.[27]   The defense objected, explaining at sidebar that the prosecution's remarks "denigrat[ed] the defense."   *Id.* at 1451.   The district court agreed that it was improper for the government to suggest "that there is something wrong or different or flawed about what defense counsel did by having an inconsistent theory."   *Id.* at 1452.   After a lengthy sidebar requiring it to address other matters, the district court "sustain[ed] the defense's objection" and instructed

---

[27] The challenged prosecution argument reads as follows:

> Only one of the proposed mitigators relates to the crimes that the defendant committed, and that's No. 1.   Specifically[,] No. 1 states that neither John Taylor nor Efrain Johnson will receive the death penalty for their roles in the offense.

> The defense is trying to bolster this factor by relying upon Johnson's statements to law enforcement, statements which are not only internally inconsistent and not only inconsistent with the forensic and testimonial evidence, *but also inconsistent with the defendant's theory of the case during the guilt phase.*

> For instance, Johnson claims that the only weapon he saw was a ten-inch pipe that Taylor allegedly whipped out of his pocket.   Well, you know from the medical examiners and [expert witness] Tom Martin that the victims were not killed with a ten-inch pipe.   There was blood on the walls and blood dripping from the ceiling, and the slaughterhouse effect in the southwest bedroom must have been made, as you learned from Tom Martin, with a weapon of sufficient length and surface area to splatter that quantity of blood up to the 9'3[-]7/8 inch ceiling.

> So ask yourself, why did the defense introduce [Efrain] Johnson's statements?   The government submits that it was in an effort to shift blame from the defendant to Taylor, to make Taylor look like he was more involved in these offenses than he testified to here at trial.   But you saw Taylor testify and you saw him get cross-examined; the cross-examination where he wasn't asked one question about what role he actually played in the offense.   Why?   *Because then the defense theory was that Taylor wasn't even there for the murders.*

Gov't App'x 1451 (emphasis added).

79

the jury "not [to] take into account in [its] deliberations at the penalty phase the strategic conduct of counsel": "This is for you to assess based on what you find proved and what you conclude about the defendant and the government's proof." *Id.*

The government's error violated a specific constitutional guarantee. The Sixth Amendment affords a defendant the right to a "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted); *Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006). The law does not cabin that right to consistent defense theories. Rather, it demands that defendants be allowed "to present wholly inconsistent defenses." *United States v. Goldson*, 954 F.2d 51, 55–56 (2d Cir. 1992). "When specific guarantees of the Bill of Rights are involved," courts "take[] special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Following that mandate here, we conclude that the government violated Aquart's Sixth Amendment right when it urged the jury to draw an adverse inference from the fact that the defense had advanced different theories as to confederate Taylor's role at the guilt and penalty phases of trial.

In assessing the seriousness of this error, we are mindful that (1) the prosecution's argument did not reference matters outside the

record of which the jury would otherwise have been unaware,[28] and (2) the district court made some effort to mitigate the error by sustaining objection.[29] We do not foreclose the possibility that in other contexts, such circumstances might allow a reviewing court to conclude that the error did not inform the jury verdict. But we cannot confidently reach that conclusion here.

First, the objectionable argument, viewed in context, appears to have faulted the defense not only for advancing inconsistent theories in general, but also for advancing theories that the defense did not itself believe. Specifically, the prosecution's argument can be understood to insinuate that the defense either (1) did not believe "that Taylor wasn't even there for the murders"—its guilt-phase theory—because it knew Efrain Johnson's statements were to the contrary, Gov't App'x 1451; or (2) did not believe Efrain Johnson that Taylor played an active role in the charged murders—its penalty-phase theory—because it had not asked Taylor a single role question on cross-examination at the guilt phase. Either way, the prosecution was improperly injecting a "sharp practice" accusation into the jury's deliberations, where such accusations have no role to play. More troubling still, just as it was error for the prosecution, on cross-

---

[28] This case is not akin to *United States v. Forlorma*, 94 F.3d 91 (2d Cir. 1996), wherein the prosecution's objectionable argument presented the jury with new and inaccurate facts, *see id.* at 94–96.

[29] This case is also not akin to *United States v. Whitten*, 610 F.3d 168. There, the district court did not sustain, but rather *overruled*, objection to a prosecution summation argument that challenged a capital defendant's professed acceptance of responsibility as a mitigating factor on the ground that it was inconsistent with the defendant's decision to stand trial. *See id.* at 194.

examination of Agent Munger, to insinuate its own adverse view of Efrain Johnson's credibility, so too it was error, on summation, for it to insinuate that the defense also did not believe Johnson. Indeed, when the two errors are considered together, a jury might be left with the impression that neither the prosecution nor the defense believed Efrain Johnson, thus erecting an especially high hurdle for a jury to make its own credibility assessment.

Second, while the district court's instruction for the jury "not [to] take into account . . . the strategic conduct of counsel," *id*. at 1452, may have mitigated the error of suggesting general impropriety in the advancement of inconsistent defense theories, the charge did not address the particular concerns just noted, *i.e.*, insinuations of both sharp practice and adverse witness credibility determinations by the defense.[30] We are mindful that Aquart did not object to the given charge or seek further instruction, which limits his ability to claim prejudice on appeal. *See generally United States v. Melendez*, 57 F.3d at 242. But in the circumstances of this case, where the government had already engaged in one negative vouching error respecting the Efrain Johnson statements, its summation insinuation that defense counsel also did not believe Johnson was serious error, making it especially

---

[30] We do not think the district court's instruction manifests the sort of error identified in *United States v. Spangelet*, 258 F.2d 338 (2d Cir. 1958). The trial court there, far from sustaining defense objection to the prosecutor's impermissible interjection of his own credibility into the case, appeared to approve the misconduct. *See id.* at 342–43. It was in this context that we faulted the court for giving "the jury the impression that the defendant's counsel rather than the prosecution was being admonished." *Id.* at 343. Here, the district court did nothing to signal approval of the prosecution's stricken argument. Thus, our concern here is not with the content of the district court's instruction, but with its sufficiency to mitigate the particular harm identified.

82

important for jurors clearly to understand that they were the *sole* judges of witness credibility, and that any impression they may have been given as to the lawyers' or parties' views on credibility was to be completely ignored. In these circumstances, more than general instructions were necessary to dispel the misimpressions given by the prosecution on both cross-examination and summation as to credibility assessments. Absent more focused and emphatic instruction, we cannot confidently reach the necessary final conclusion that, even absent these errors, the jury would still have voted for the death penalty in this case. *See United States v. Friedman*, 909 F.2d at 709–10 (explaining why "modest," rather than "emphatic" response to government error was "insufficient" in circumstances to allow reviewing court "confidently" to say that "conviction would surely have been obtained in the absence of the misconduct").

The nature of a capital sentencing proceeding only reinforces our concern. In such proceedings, juries are asked to find aggravating and mitigating factors not as ends in themselves, but as part of a larger process that channels the jury's sentencing discretion in ways that safeguard against arbitrary capital decisions, the critical constitutional concern. *See infra* at Discussion Section II.D.2–3. Viewed in that context, prosecution errors directed at a particular mitigator not only can infect jury determinations as to that mitigator (and the credibility of witnesses supporting the mitigator) but also can skew the ultimate balance whereby the jury determines whether a defendant is sentenced to death or life imprisonment. In some cases, it may be possible for a reviewing court to conclude, from a jury

83

finding that a challenged mitigator was proved, that prosecution errors directed toward that mitigator were not serious, and that the jury would have returned the same verdict in any event. But the conclusion is not invariable given that mitigation factors need only be proved by a preponderance of the evidence and, even when proved, can be assigned as much or as little weight as a jury chooses in capital sentencing balance. Here, the government did not seriously challenge the mitigation factor that Taylor and Efrain Johnson were not facing the death penalty. Its focus—the focus of its cross-examination and summation errors—was on the weight that should be assigned that factor in the jury's capital sentencing balance. The district court commendably recognized the government's errors and sustained objections. But its curative instructions were not sufficiently focused and emphatic to dispel insinuations of sharp practice and of adverse credibility determinations by the defense as well as the prosecution regarding Efrain Johnson. It is these circumstances that do not permit us to conclude that the jury in this case would have returned the same capital sentence even absent these errors.

Accordingly, we vacate Aquart's death sentence and remand for a new penalty proceeding.

## C. Sufficiency Challenge

Aquart argues that the evidence adduced as to two cited aggravating factors, *i.e.*, "substantial planning and premeditation" and "multiple killings," was insufficient to warrant their presentation to the jury. *See* 18 U.S.C. § 3595(c)(1) (providing, in capital cases, for

84

appellate review of "whether the evidence supports the special finding of the existence of an aggravating factor"). Our decision to vacate and remand on other grounds does not obviate the need to address this sufficiency argument because our determination necessarily informs pursuit of these aggravators on remand.

We need not decide here whether our sufficiency review is limited to plain error by Aquart's failure to raise these challenges in the district court, or to still-stricter "manifest injustice" review, as urged by the government. Appellee's Br. 181–82, 207. We conclude that, even on *de novo* review, Aquart's sufficiency challenges fail on the merits. *See Lewis v. Jeffers*, 497 U.S. 764, 781–83 (1990) (applying *Jackson v. Virginia*, 443 U.S. at 319, in § 2254 context, to sufficiency review of capital aggravating factor); *United States v. Taylor*, 814 F.3d 340, 367–68 (6th Cir. 2016) (same).

In urging otherwise, Aquart invokes the "equipoise rule" derived from *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002). As this court has explained, however, that rule is of "no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) (internal quotation marks omitted); *accord Cavazos v. Smith*, 565 U.S. 1, 7 (2011).[31] Thus, we have held the equipoise rule to apply only where evidence "is nonexistent or so meager" as to preclude the inferences necessary to a finding favorable

---

[31] *See also United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (*en banc*) (abandoning equipoise-rule equivalent); *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431–32 (3d Cir. 2013) (*en banc*) (same).

to the government. *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (internal quotation marks omitted). That is not this case.

### 1. Substantial Planning and Premeditation Aggravator

Aquart argues that the evidence shows that, on entering Apartment 101, his only plan was to commit assault or robbery, precluding a jury finding that the ensuing murders were premeditated. In support, Aquart points to Taylor's testimony that *he* thought he was participating only in a robbery, as well as to a statement by one of Aquart's dealers (who participated in a dry run for the charged crimes) that *he* did not suspect Aquart's intent to be murder. Aquart further maintains that Azikiwe Aquart's question to Taylor upon leaving Apartment 101—"Did you hear the people say our names?" Gov't App'x 582—would have been unnecessary if the participants' intent from the start had been to kill everyone.

The argument fails because what subordinates knew (or professed to know) was not determinative of Aquart's own intent. In fact, the jury heard ample evidence to support its finding that Aquart's premeditated intent on entering Apartment 101 was murder.

Notably, Aquart admitted as much to fellow inmate Shamarr Myers while awaiting trial in this case. Aquart told Myers that he had been having problems with people selling crack in competition with him. He initially "told them they had to go," but then decided "they had to die." *Id.* at 911. Aquart argues that it is not clear from the latter

86

statement that he had reached a death decision even before entering Apartment 101. But a reasonable jury could have inferred as much from evidence that Aquart began planning his attack on the residents of Apartment 101 soon after Tina Johnson defied his oral orders, and from the fact that he told Myers they "had to die," with no suggestion that death was the unintended consequence of a premeditated plan only to rob or assault.

In any event, the circumstances of the murders supported the jury's finding of planning and premeditation. *See Ratzlaf v. United States*, 510 U.S. 135, 149 n.19 (1994) (stating that jury may find requisite *mens rea* "by drawing reasonable inferences from the evidence of defendant's conduct"); *accord United States v. MacPherson*, 424 F.3d at 189. The jury heard that Aquart was not at all hesitant to use non-deadly force, by himself and seemingly spontaneously, to cause serious injury to persons who jeopardized his drug operations. Yet, he did not follow that course with respect to the occupants of Apartment 101. Rather, he recruited three men to help him attack those occupants, and he armed his confederates and himself with weapons capable of taking lives, specifically, baseball bats and a gun. Aquart also equipped everyone with duct tape, masks, and gloves in advance of the attack. Within moments of entering Apartment 101, Aquart and his confederates used the tape to bind the victims' hands, feet, and heads, and then beat the victims to death. These facts sufficed to support the jury's finding that murder was no afterthought, but Aquart's premeditated intent.

Aquart argues that the assailants' use of masks and gloves precludes a finding of premeditated murder because there would have been no need for the assailants to conceal their identities if his intent, from the outset, had been to kill the victims. The argument goes to the weight of the evidence, not to its sufficiency. Aquart cannot prevail on a sufficiency challenge merely by showing that inferences favorable to him plausibly could be drawn from the evidence. *See United States v. Downing*, 297 F.3d 52, 56–57 (2d Cir. 2002). Rather, he must show that the evidence, even when viewed most favorably to the government, would not allow *any* rational jury to find premeditated murder. *See Jackson v. Virginia*, 443 U.S. at 319; *United States v. Pierce*, 785 F.3d at 838. He has not made that showing here. A reasonable jury could well have concluded that even premeditated murderers may employ masks and gloves, mindful that a victim might escape or survive, someone else might recognize the assailants entering or exiting the apartment, and criminal investigators will undoubtedly conduct a careful forensic examination of a murder scene.

Aquart argues that the very likelihood of a homicide investigation means he must have been planning lesser harms because such heightened police attention would jeopardize his Charles Street drug business. The hypothesis assumes facts not supported by either the record or human experience, *i.e.*, (1) that criminals always act rationally, and (2) that Tina Johnson, if subjected to a lesser assault, would not have attributed the attack to Aquart and

88

acted on her threat to contact the police and have them shut down all drug dealing at 215 Charles Street.

Nor was a jury finding of premeditated murder precluded by Taylor's testimony that Aquart took possession of Tina Johnson's cell phone and money in the apartment before taping and beating his victims. Insofar as Aquart contends that this testimony supports an inference that robbery was the only premeditated object, and the murders were "a spur-of-the-moment action," Appellant's Br. 124, such an inference, even if plausible, does not mean the totality of the evidence was insufficient to support the jury's finding of premeditated murder. A reasonable jury could have found that Aquart wanted to deprive Tina Johnson of both a means to call for help and the profits he thought she had diverted from him before also depriving her and her confederates of their lives. Such a conclusion was supported by the fact that Aquart did not leave Apartment 101 after taking this property but, rather, proceeded to tape and viciously beat his victims with deadly tools brought to the apartment.

In sum, because the evidence was sufficient to allow a reasonable jury to find that Aquart planned and premeditated his victims' murders before he entered Apartment 101, his sufficiency challenge to that aggravating factor fails on the merits.

### 2. Multiple Killings Aggravator

In urging a multiple killings aggravator, the government argued that Aquart personally killed Tina Johnson and Basil Williams "by beating them over the head with baseball bats." Gov't App'x

1449.  Aquart does not dispute the sufficiency of the evidence to prove that he personally killed Tina Johnson, but he does challenge its sufficiency to prove that he personally killed Basil Williams.  The argument fails on the merits and, thus, we need not here consider the government's argument that less than personal involvement in murder—*e.g.*, aiding, abetting, or procuring a murder—could support this aggravator.

The evidence that Aquart personally killed Basil Williams is circumstantial rather than direct and includes the following: (1) Aquart conceived, organized, and led the murder scheme; (2) Aquart personally killed Tina Johnson with one baseball bat, his brother Azikiwe Aquart personally killed James Reid with the other bat, and confederates Taylor and Efrain Johnson denied killing anyone; (3) Aquart remained in Apartment 101 after all his confederates had left and at which time Williams was still alive; (4) the next morning Williams was found dead, bound and bludgeoned to death in the same manner as Tina Johnson and Reid; (5) Aquart's fingerprints were among those found in the same room as Williams's body; (6) when the victims' bodies were discovered, the front door of Apartment 101 had been drilled shut from the inside; and (7) the morning after the murder, Aquart gave his girlfriend Lashika Johnson a drill and told her to dispose of it.

In challenging sufficiency, Aquart highlights gaps or shortcomings in this evidence that he submits admit a possibility that one of his confederates killed Williams and, thus, preclude a jury finding beyond a reasonable doubt that Aquart personally did so.  To

90

succeed on a sufficiency challenge, however, Aquart must do more than advance a theory of the evidence consistent with his not having killed Basil Williams. *See United States v. Downing*, 297 F.3d at 56–57. He must show that the evidence viewed most favorably to the government would not allow any rational jury to find that Aquart personally killed Williams. *See Jackson v. Virginia*, 443 U.S. at 319; *United States v. Pierce*, 785 F.3d at 838. Aquart cannot make that showing because the record evidence admits a chain of reasonable inferences that would allow a jury to find that he personally murdered Williams.

First, from Aquart's leadership role in the murder scheme, the jury reasonably could have inferred that it was he who determined that all three occupants of Apartment 101—Tina Johnson, James Reid, and Basil Williams—had to die. Indeed, he acknowledged as much to fellow inmate Shamarr Myers. Second, from the fact that the three victims were bound and killed in the same manner on the same day, the jury could have concluded that all three murders were committed by the Aquart crew, and not by any other persons. Third, from Aquart's own killing of Tina Johnson, the jury could have concluded that he had no qualms about personally taking a human life and, thus, would not have hesitated to kill Williams himself. Fourth, from the fact that the four assailants had two baseball bats among them, and that Aquart and his brother first used those bats to beat Tina Johnson and Reid, the jury could have concluded that Williams was beaten to death thereafter. Fifth, from Taylor's testimony that he left the apartment while the Aquart brothers were beating Tina Johnson and

Reid, and that he (Taylor) beat no one, the jury could have concluded that Taylor did not kill Williams. Sixth, from Efrain Johnson's statement to his sister that the victims were all alive when he left the apartment, and that only Aquart then remained behind, the jury could have concluded that Efrain Johnson did not kill Williams and that Aquart was the only assailant who could have done so. Seventh, from the identification of Aquart's fingerprints in the room where Williams was killed, the jury could have concluded that Aquart was at Williams's murder scene and, thus, had the opportunity as well as the motive to commit that crime. Eighth, from the drilling shut of the apartment from the inside and from Aquart's giving Lashika Johnson a drill to dispose of a few hours after the murders, the jury could further have concluded that he was the last assailant in the apartment and, thus, the only one with the opportunity to kill Williams.

Aquart argues that no reasonable jury could have made this chain of inferences because it required crediting both Taylor's trial testimony and Efrain Johnson's statements to his sister about his departure from Apartment 101, which accounts were inconsistent. Specifically, Aquart argues that Taylor testified that he and Azikiwe Aquart left Apartment 101 before both Efrain Johnson and Aquart, at which time Tina Johnson and Reid were presumably already dead. Meanwhile, Efrain Johnson told his sister that when he later departed Apartment 101, leaving only Aquart behind, all the victims were still alive.

The argument fails because the urged inconsistency is not as clear as Aquart contends. Taylor did not specifically testify that Tina

92

Johnson and Reid were dead when he left the apartment. Rather, he testified that he left when Aquart and his brother were beating these two bound victims. But even assuming the urged inconsistency, it does not show insufficiency because a jury "is free to believe part, and to disbelieve part, of any given witness's testimony," *United States v. Praddy*, 725 F.3d 147, 152 (2d Cir. 2013), and a reviewing court must assume it believed the parts that support its verdict, *cf. United States v. Coppola*, 671 F.3d 220, 233 (2d Cir. 2012). Here, the jury could have credited both Taylor and Efrain Johnson as to when they left Apartment 101 relative to their confederates and, thus, concluded that Aquart was the last to remain in the apartment. The jury also could have credited Efrain Johnson insofar as he reported that Williams was still alive when he left the apartment, without necessarily crediting his report that Tina Johnson and Reid also were alive. Assuming that the jury credited Taylor that Efrain Johnson was in Williams's bedroom while the Aquart brothers (armed with the only two baseball bats) were in another bedroom beating Tina Johnson and Reid, the jury could have found Efrain Johnson more reliable as to Williams's condition than as to that of the other victims.

In sum, because we conclude that the circumstantial evidence was sufficient to allow a reasonable jury to find that Aquart personally killed Basil Williams, Aquart's sufficiency challenge to the multiple-killings aggravator fails on the merits.

93

## D. Constitutionality Challenges to Death Penalty

Aquart raises various constitutional challenges to his capital sentence that, if successful, would make the appropriate relief vacatur and remand for the imposition of a term of imprisonment by the district court rather than vacatur and remand for a new penalty proceeding before a jury. Accordingly, we now explain why we reject these challenges.[32]

### 1. *Per Se* Eighth Amendment Challenge

Aquart urges this court to hold that the death penalty is necessarily "cruel and unusual punishment[]" and, thus, *per se* violative of the Constitution. U.S. CONST. amend. VIII. This panel is precluded from so ruling by controlling Supreme Court and circuit precedent, specifically, *Gregg v. Georgia*, 428 U.S. 153 (1976), and *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002). *Quinones* recognized that, in *Gregg*, the Supreme Court "expressly held . . . that capital punishment does not constitute a *per se* violation of the Eighth Amendment" for crimes involving intentional murder. *United States v. Quinones*, 313 F.3d at 67 (citing *Gregg v. Georgia*, 428 U.S. at 207 (joint opinion of Stewart, Powell, and Stevens, JJ.)).[33]

---

[32] While our concurring colleague suggests that some of Aquart's arguments need not be addressed at this time, we think it important to explain why he is entitled only to a new capital sentencing hearing and not to a non-capital sentence as a matter of law.

[33] The joint opinion of Justices Stewart, Powell, and Stevens in *Gregg v. Georgia*, 428 U.S. at 158–207, subsequently has been recognized as the controlling opinion of the Court. *See Johnson v. Texas*, 509 U.S. 350, 360 (1993) (citing "joint opinion of [those] three Justices" as

94

In urging otherwise, Aquart argues that, in the 15 years since *Quinones*, national standards of decency—reflected in legislative enactments, state court decisions, and federal and state capital practice—have evolved to reflect a consensus against capital punishment. *See generally Roper v. Simmons*, 543 U.S. 551, 560–61 (2005) (grounding Eighth Amendment jurisprudence in "evolving standards of decency that mark the progress of a maturing society" (internal quotation marks omitted)). Whatever the merits of Aquart's argument, only the Supreme Court can overrule *Gregg* or recognize exceptions thereto. *See Agostini v. Felton*, 521 U.S. 203, 238 (1997) (holding that lower courts must follow Supreme Court precedent "unless and until" reinterpreted by that Court); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (holding that if Supreme Court precedent has direct application to case, "the Court of Appeals should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions"); *accord United States v. Quinones*, 313 F.3d at 62 n.10, 69 (applying *Agostini* and *Rodriguez de Quijas* to conclude that Eighth Amendment challenge to capital punishment was foreclosed by *Gregg*).

Aquart nevertheless points out that, since *Gregg*, the Supreme Court itself has ruled that the Eighth Amendment categorically precludes a death sentence for certain defendants, specifically, minors, *see Roper v. Simmons*, 543 U.S. at 575, and those with

"controlling"). Accordingly, where we cite *Gregg* elsewhere in this opinion, we refer only to that joint opinion unless we denote otherwise.

95

intellectual disability, *see Atkins v. Virginia*, 536 U.S. 304, 321 (2002); and for certain crimes, notably, rape, *see Kennedy v. Louisiana*, 554 U.S. 407, 422–24, 433–34, 446–47 (2008) (holding death sentence for rape of minor to constitute cruel and unusual punishment); *Coker v. Georgia*, 433 U.S. 584, 597–98 (1977) (plurality opinion) (holding death sentence for rape of adult woman violates Eighth Amendment), and non-intentional killings, *see Enmund v. Florida*, 458 U.S. 782, 787–88, 801 (1982) (holding that death penalty could not be imposed on defendant who did not commit, had no intention of committing, and did not cause to be committed, two murders in course of robbery). Nowhere, however, has the Supreme Court suggested that, contrary to *Gregg*, such a categorical conclusion might be reached with respect to (1) crimes of intentional murder (2) committed by mentally unimpaired adults. In those circumstances, *Gregg*'s holding continues to control: "when a life has been taken deliberately by the offender, we cannot say that [capital] punishment is invariably disproportionate to the crime." *Gregg v. Georgia*, 428 U.S. at 187 (footnote omitted).

In short, in identifying crimes for which the death penalty is a disproportionate and, therefore, cruel and unusual punishment, the Supreme Court recognizes "a line 'between [intentional] homicide and other serious violent offenses against the individual.'" *Graham v. Florida*, 560 U.S. 48, 69 (2010) (quoting *Kennedy v. Louisiana*, 554 U.S. at 438). Explaining the distinction, the Court has observed that while "nonhomicide crimes against individual persons . . . may be devastating in their harm, . . . 'in terms of moral depravity and of the

injury to the person and to the public,' they cannot be compared to murder in their 'severity and irrevocability.'" *Kennedy v. Louisiana*, 554 U.S. at 438 (quoting *Coker v. Georgia*, 433 U.S. at 598 (plurality opinion)); *see Graham v. Florida*, 560 U.S. at 69 (observing that, although "robbery or rape is a serious crime deserving serious punishment, those crimes differ from homicide crimes in a moral sense" (internal quotation marks omitted)). Thus, although the Supreme Court, after *Gregg*, has held the death penalty categorically unconstitutional for certain defendants and certain non-homicidal crimes, *Gregg*'s rejection of such a categorical conclusion for crimes of intentional murder committed by mentally unimpaired adults continues to control this court.

No different conclusion is warranted because Aquart stands convicted of intentional murder under the VICAR and CCE statutes. Aquart does not suggest that the moral depravity and irredeemable injury of intentional murder are somehow mitigated by the VICAR or CCE context. Indeed, Congress might reasonably have deemed those contexts aggravating. *See generally Kennedy v. Louisiana*, 554 U.S. at 437 (deferring determination whether "offenses against the State" such as "treason, espionage, terrorism, and drug kingpin activity" might warrant death penalty where victim's life not taken); *United States v. Thomas*, 757 F.2d 1359, 1370 (2d Cir. 1985) (observing that "Congress's express purpose in enacting the Organized Crime Control Act[] . . . [and] RICO . . . was to provide *increased* penalties for racketeering activity" (emphasis in original) (internal quotation marks omitted)).

97

In any event, "time and again" since *Gregg,* and as recently as 2015, the Supreme Court has consistently "reaffirmed that capital punishment is not *per se* unconstitutional" for diverse intentional murders. *Glossip v. Gross*, 135 S. Ct. 2726, 2739 (2015) (collecting cases).[34] Notably, plaintiff Glossip stood convicted of the capital murder of his employer, which he accomplished by hiring a contract killer who beat the sleeping victim to death with a baseball bat. *See id.* at 2735. This scenario resembles the instant case except, of course, that Aquart personally wielded a baseball bat to murder victims who were all-too-awake for their executions. Further, in each of the last three terms, the Supreme Court has denied writs of *certiorari* to capital murder defendants urging the *per se* unconstitutionality of the death penalty. *See Hidalgo v. Arizona*, 138 S. Ct. 1054 (2018) (challenging capital murder conviction for carrying out gang contract); *Reed v. Louisiana*, 137 S. Ct. 787 (2017) (challenging capital murder conviction for shooting deaths of three brothers, aged 20, 18, and 13); *Tucker v. Louisiana*, 136 S. Ct. 1801 (2016) (challenging capital murder conviction for shooting death of pregnant girlfriend).

Thus, to the extent Aquart asks this court to hold the death penalty categorically unconstitutional either for intentional murders generally or for VICAR and CCE murders in particular, we remain bound by *Gregg* and *Quinones* to reject the argument.

---

[34] Aquart acknowledges that most of the arguments he advances in urging the *per se* unconstitutionality of the death penalty were articulated by Justice Breyer in his dissenting opinion in *Glossip v. Gross*, 135 S. Ct. at 2755 (Breyer, J., dissenting), and have not been adopted by a majority of the Court.

## 2. Proportionality Challenge

Aquart argues that, even if the death penalty is not categorically unconstitutional, his death sentence must be vacated because, "considering both the crime and the defendant, the sentence is disproportionate to that imposed in similar cases" and, thus, cruel and unusual. *Pulley v. Harris*, 465 U.S. 37, 44 (1984). We are not persuaded.

     a.    <u>Judicial Proportionality Review Is Not Constitutionally Mandated for Capital Sentences Under the Federal Death Penalty Act</u>

When, as here, a defendant convicted of intentional murder appeals a capital sentence, the Federal Death Penalty Act ("FDPA") mandates judicial review of "the entire record," including "the evidence submitted during the trial," "the information submitted during the sentencing hearing," "the procedures employed in the sentencing hearing," and "the special findings returned" by the jury on aggravating and mitigating factors. 18 U.S.C. § 3595(a), (b). Upon such review, the appellate court must "address all substantive and procedural issues raised on . . . appeal," and "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592." *Id.* § 3592(c)(1). What the statute does not require is judicial proportionality review of the

99

challenged death sentence as compared to sentences in other capital cases. Aquart argues that such review is constitutionally required to safeguard against random and capricious death sentences—the Eighth Amendment concern prompting the Supreme Court to invalidate Georgia's then-existing capital sentencing scheme in *Furman v. Georgia*, 408 U.S. 238, 239–40 (1972).

The argument fails because, while the Supreme Court has cited approvingly to statutorily mandated proportionality review in rejecting constitutional challenges to state sentencing schemes, *see, e.g., Gregg v. Georgia*, 428 U.S. at 198, it has "ma[de] clear" that such precedent "do[es] not establish proportionality review as a constitutional requirement," *Pulley v. Harris*, 465 U.S. at 44–45 ("[T]hat some schemes providing proportionality review are constitutional does not mean that such review is indispensable."). Indeed, in *Pulley*, the Court explained that the "components of an adequate capital sentencing scheme" do not demand "comparative review" but, rather, "'a carefully drafted statute that ensures that the sentencing authority be given adequate information and guidance.'" *Id.* at 46 (quoting *Gregg v. Georgia*, 428 U.S. at 195); *accord McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (acknowledging state court's finding that death sentence was not disproportionate, but holding that "where the statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required"). A capital statutory scheme that limits the number of death-eligible crimes, requires bifurcated proceedings, demands proof of at least one aggravating factor, gives the jury broad discretion to consider

100

mitigating circumstances, and provides the jury with standards to guide its use of aggravating and mitigating information, has been recognized as sufficient to "minimize[] the risk of wholly arbitrary, capricious, or freakish sentences." *Pulley v. Harris*, 465 U.S. at 45 (discussing *Gregg v. Georgia*, 428 U.S. at 197–98). In sum, comparative proportionality review may be constitutionally required only when a capital sentencing system lacks such adequate checks on arbitrariness. *See id.* at 51.

The FDPA contains precisely the sort of checks the Supreme Court recognized in *Pulley* to obviate the need for proportionality review. It restricts the death penalty to an enumerated list of eligible crimes, *see* 18 U.S.C. § 3591, and requires a bifurcated trial, first to determine guilt, and only then to determine punishment, *see id.* § 3593(b). If a jury finds a defendant guilty of a death-eligible crime, the statute limits jury discretion to vote a death sentence to those defendants unanimously found beyond a reasonable doubt to have acted (a) with specific culpable intent, *see id.* § 3591(a)(2); and (b) under circumstances specified in at least one statutory aggravating factor, *see id.* §§ 3592(c), 3593(e)(2). If a jury finds both these statutory requirements satisfied, it must consider non-statutory aggravating factors that it finds proved beyond a reasonable doubt as well any mitigating factors established by a preponderance of the evidence to the satisfaction of even a single juror. *See id.* § 3593(c), (d). A jury must then carefully weigh such aggravating and mitigating factors and only if it unanimously concludes that the aggravating factors so outweigh the mitigating factors as to justify a capital

101

sentence can the jury return a death verdict. *See id.* § 3593(e). A capital jury, however, is never required to return a death sentence. *See Callins v. Collins*, 510 U.S. 1141, 1141–42 (1994) (Scalia, J., concurring in denial of writ of *certiorari*) (referencing jury's "unlimited" "discretion not to impose death (to extend mercy)" (emphasis omitted)). The FDPA further channels a capital jury's discretion to impose the death penalty by prohibiting it from considering race, color, religious beliefs, national origin, or sex in its sentencing decision and, indeed, requiring each juror to sign a certificate that such factors did not inform his or her sentencing decision. *See* 18 U.S.C. § 3593(f). Finally, the FDPA is structured so that, if the jury does not vote for the death penalty, its decision is unreviewable. If it does vote for the death penalty, however, the statute affords a defendant who appeals his sentence the comprehensive record review detailed at the start of this section.

The six of our sister circuits to have considered the question have each concluded that these federal statutory procedures sufficiently safeguard against arbitrary and capricious death sentences to satisfy the Eighth Amendment. *See, e.g., United States v. Lawrence*, 735 F.3d 385, 418–19 (6th Cir. 2013); *United States v. Lighty*, 616 F.3d 321, 368 n.44 (4th Cir. 2010); *United States v. Mitchell*, 502 F.3d 931, 982 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 23–25 (1st Cir. 2007); *United States v. Jones*, 132 F.3d 232, 248–49 (5th Cir. 1998); *see also United States v. Allen*, 247 F.3d 741, 757–58 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002). We now reach the same conclusion. And because we conclude that these federal "statutory

102

procedures adequately channel the sentencer's discretion," we further conclude that, contrary to Aquart's argument, "proportionality review is not constitutionally required." *McClesky v. Kemp*, 481 U.S. at 306; *see Pulley v. Harris*, 465 U.S. at 46.

b.  Aquart's Death Sentence Is Not
Constitutionally Disproportionate

Even if Aquart had shown the Eighth Amendment to require proportionality review, he fails to show that a capital sentence in his case would be constitutionally disproportionate. As already emphasized, each of Aquart's capital crimes involved intentional murder. Aquart does not argue that the death penalty is a disproportionate punishment for such crimes. Nor could he in light of Supreme Court precedent. *See Coker v. Georgia*, 433 U.S. at 592 (plurality opinion) (construing *Gregg v. Georgia* to hold that "death penalty for deliberate murder [is] neither the purposeless imposition of severe punishment nor a punishment grossly disproportionate to the crime"); *cf. Kennedy v. Louisiana*, 554 U.S. at 420 (observing that "death penalty can be disproportionate to the crime itself where the crime did not result, or was not intended to result, in death of the victim"). Nor does Aquart argue that his murders are somehow mitigated by having been committed in the context of serious federal crimes proscribing racketeering and continuing drug enterprises. Aquart also does not argue that the proved aggravating circumstances of the murders are constitutionally insufficient to support a capital sentence in this case. *See United States v. Lawrence*, 735 F.3d at 417 (explaining that capital punishment requires proof of

"aggravating circumstance" that does "not apply to every defendant convicted of a murder" (internal quotation marks omitted)). Instead, he argues that the jury's unanimous finding as to one mitigating factor, specifically, that he could safely and securely be confined for the rest of his life, renders his death sentence aberrational and, therefore, disproportionate.

In support, Aquart cites precedent and scholarship recognizing "future dangerousness" as an important sentencing factor generally and particularly in the capital context. *See, e.g., Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) (plurality opinion) (stating that "defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system"); Scott E. Sundby, *War and Peace in the Jury Room: How Capital Juries Reach Unanimity*, 62 Hastings L.J. 103, 117 (2010) (observing that "first concern" of jurors after convicting defendant of murder is "ensuring that, above all else, the defendant will never kill again. Jurors consistently expressed the view . . . that they would vote for a death sentence if they were not assured that the defendant would be safely locked away.").

A finding like the one made by the jury in this case, that the Bureau of Prisons can safely and securely incarcerate Aquart for the rest of his life, does not equate to a finding that he poses no risk of future dangerousness. It means only that the jury found that the Bureau of Prisons could satisfactorily minimize that risk, likely by detaining Aquart in the highly restrictive conditions of one of its maximum security facilities.

104

Further, even assuming that a jury's *unassuaged* concern about a capital defendant's future dangerousness, despite his incarceration, would weigh heavily in favor of the death penalty, it does not necessarily follow that a jury's finding that the defendant could be safely incarcerated renders a capital sentence constitutionally disproportionate. Aquart points to statistics purportedly showing that in only a handful of the 78 federal capital cases where juries have voted for the death sentence did a majority of jurors find non-dangerousness as a mitigating factor. But this ignores the myriad other aggravating and mitigating factors that could have informed jury decisions to impose or not to impose the death sentence in each particular case. To isolate a single mitigating factor and argue it is determinative of a constitutional sentence runs afoul of the principle grounded in *Furman* and codified in the FDPA, *see* 18 U.S.C. § 3593(e), that a jury's death penalty determination must result from an individualized, careful, and holistic consideration of *all* aggravating and mitigating factors. *See United States v. Fell*, 531 F.3d at 236 (holding that district court correctly informed jury that "it should make a qualitative assessment of the aggravating and mitigating evidence as a whole"); *see also Glossip v. Gross*, 135 S. Ct. at 2748 (Scalia, J., concurring) (rejecting use of single factor (egregiousness of crime) to challenge death penalty as arbitrary, explaining that Supreme Court requires individualized consideration of all factors "that render a punishment condign").

In sum, we reject Aquart's argument that the Eighth Amendment requires judicial proportionality review of any death

105

sentence under the FDPA. In any event, we identify no merit in Aquart's particular proportionality challenge to the death sentence voted by the jury in his case.

### 3. Arbitrariness Challenge

In a variation on his proportionality argument, Aquart submits that the infrequency with which federal juries vote for death sentences shows that the FDPA operates in an arbitrary and capricious manner that both results in cruel and unusual punishments and violates due process. *See* U.S. CONST. amend. V, amend. VIII. In support, he cites to those opinions in *Furman v. Georgia* that linked the infrequency of death verdicts in capital cases under Georgia law—there, approximately 15–20%, *see* 408 U.S. at 386 n.11 (Burger, C.J., dissenting)—to the ultimate finding of unconstitutional arbitrariness, *see id.* at 309–10 (Stewart, J., concurring) (stating that "petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed"); *id.* at 313 (White, J., concurring) (observing that under challenged scheme "death penalty is exacted with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not").

These arguments fail because, as the Supreme Court's post-*Furman* capital jurisprudence makes clear, the reason the infrequency of death sentences *for intentional murder* raised constitutional concern in *Furman* was not because death was a disproportionate sentence for

that crime but because Georgia's then-available sentencing procedures were inadequate to ensure that death sentences were not being arbitrarily and capriciously imposed in individual cases. *See Gregg v. Georgia*, 428 U.S. at 187, 189 (holding death sentence not invariably disproportionate punishment for intentional murder, but "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action"). Thus, as the Court more recently explained in *Kansas v. Marsh*, 548 U.S. 163 (2006), *Furman* and *Gregg* instruct that, to be held constitutional, a "capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Id.* at 173–74; *see Jones v. United States*, 527 U.S. at 381 ("[F]or a capital sentencing scheme to pass constitutional muster, it must perform a narrowing function with respect to the class of persons eligible for the death penalty and must also ensure that capital sentencing decisions rest upon an individualized inquiry.").

We have already discussed how the FDPA satisfies these criteria. *See supra*, Discussion Section II.D.2.a. Where such safeguards are provided, no constitutional concern arises from the resulting infrequency with which federal juries vote a death sentence for crimes of intentional murder. *See United States v. Mitchell*, 502 F.3d at 983 (stating that "federal executions are rare . . . does not render the FDPA

unconstitutional"); *United States v. Sampson*, 486 F.3d at 24 (holding that infrequency with which "federal death penalty is sought" does not "render the FDPA unconstitutional"). That conclusion is only reinforced by the fact that the Supreme Court has mandated that a capital jury's discretion *not* to impose the death penalty, *i.e.*, to show mercy, be unlimited, a ruling that itself supports less frequent application of the death penalty. *See Callins v. Collins*, 510 U.S. at 1141–42 (Scalia, J., concurring in denial of writ of *certiorari*) (collecting cases).[35]

In urging otherwise, Aquart points to *McCleskey v. Kemp*, 481 U.S. at 308, in which the Supreme Court entertained an as-applied racial challenge to Georgia's capital sentencing scheme, despite its statutory procedural safeguards. The Court did so, however, in explaining why it rejected the particular basis for McCleskey's as-applied challenge—a statistical report purporting to show that, under the Georgia statute at issue, juries were more apt to vote death sentences against African-American defendants than white defendants. The Court expressly declined to accept the "likelihood

_____

[35] Justice Scalia thought there was an irreconcilable tension in the Supreme Court's capital jurisprudence insofar as it simultaneously demands that (1) a capital jury's "discretion to impose death must be closely confined" by clear and objective standards that provide specific and detailed guidance, but (2) its "discretion *not* to impose death (to extend mercy) must be unlimited." *Callins v. Collins*, 510 U.S. at 1141 (Scalia, J., concurring in denial of writ of *certiorari*) (emphasis in original); *see Walton v. Arizona*, 497 U.S. 639, 656–57 (1990) (Scalia, J., concurring in part and concurring in judgment) (discussing tension in detail). We do not pursue the point because the view has not been adopted by a Supreme Court majority and, in any event, favors capital defendants.

[of racial disparity] allegedly shown by the Baldus study as the constitutional measure of an unacceptable risk of racial prejudice influencing capital sentencing decisions." *Id.* at 309; *see id.* at 294–97 (explaining why "nature of the capital sentencing decision, and the relationship of the statistics to that decision, are fundamentally different" from statistical analysis in other contexts and, thus "demand exceptionally clear proof" to support inference that jury has abused its decision-making discretion).[36]

Aquart, however, seizes on a footnote in *McCleskey* noting that the cited "study in fact confirms that the Georgia system results in a reasonable level of proportionality among the class of murderers eligible for the death penalty." *Id.* at 313 n.36. He argues therefrom that *McCleskey* requires a "reasonable level of proportionality" in capital sentences, which infrequent application belies regardless of race. The footnote, however, pronounces no such holding. It simply makes the additional observation that the Georgia scheme did not, in fact, manifest the racial disproportionality McCleskey alleged, much less the "systemic defects identified in *Furman*." *Id.* at 312–13 (internal quotation marks omitted). The Court, however, had already pronounced its holding: that the likelihood of racial

---

[36] This holding necessarily defeats Aquart's efforts to use statistics to prove that race was an arbitrary factor that unlawfully contributed to his death sentence. Appellant's Br. 216–17 (asserting that both federal defendants sentenced to death in this circuit under FDPA are African-American, that 11 of 16 defendants sentenced to death nationwide were "people of color," and that 1994 House Staff Report concluded that "race continues to play an unacceptable part in the application of capital punishment" (quoting Staff of H. Judiciary Subcomm. on Civil and Constitutional Rights, Racial Disparities in Federal Death Penalty Prosecutions 1988–1994 (1994))).

disproportionality allegedly shown in the study is not the proper "constitutional measure of an unacceptable risk of racial prejudice influencing capital sentencing decisions." *Id*. at 309. This reasoning necessarily extends to Aquart's assertion that his capital case cannot be distinguished from 32 others in which juries did not vote death sentences and precludes identifying infrequency as the "constitutional measure" of a due process violation. *Id.*; *see United States v. Sampson*, 486 F.3d at 25 (holding comparative capital case summaries and verdict sheets "wholly inadequate" to prove arbitrariness).

As the Supreme Court recognized in *McCleskey*, discrepancies in capital sentencing are inevitable given that the responsibility for "express[ing] the conscience of the community on the ultimate question of life or death" is committed to the discretion of jurors who bring diverse aspects of "human nature and varieties of human experience" to the task. 481 U.S. at 310–11 (alteration in original) (internal quotation marks omitted). When such diverse individuals strive to "focus their collective judgment on the unique characteristics of a particular criminal defendant" and his capital crime, "[i]t is not surprising that such collective judgments often are difficult to explain." *Id.* at 311. The Court in *McCleskey* specifically "decline[d] to assume that what is unexplained is invidious." *Id.* at 313. Rather, *McCleskey* recognized that "the jury's function to make the difficult and uniquely human judgments that defy codification" is what "buil[ds] discretion, equity, and flexibility into a legal system." *Id.* at 311 (internal quotation marks omitted). Such discretion can,

110

moreover, inure to a defendant's benefit insofar as jury decisions not to impose the death penalty—the vast majority—are final and unreviewable, whereas its infrequent death verdicts are subject to detailed review. *See id.* at 311–12; *supra*, Discussion Section II.D.2.a. It was in this context of recognizing and approving capital sentencing discretion that may yield judgments "difficult to explain," that the Supreme Court identified the single "consistent rule" applicable to capital punishment: "that constitutional guarantees are met when the mode []for determining . . . [such] punishment[] itself has been surrounded with safeguards to make it as fair as possible." *McCleskey v. Kemp*, 481 U.S. at 313 (internal quotation marks omitted).

This reasoning applies with equal force to the infrequency of jury death verdicts. As the Supreme Court recognized in *Gregg v. Georgia*,

> . . . the relative infrequency of jury verdicts imposing the death sentence does not indicate rejection of capital punishment *per se.* Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases.

428 U.S. at 182. Thus, unless the death penalty is categorically disproportionate to the crime at issue—which *Gregg* held it was not for crimes involving intentional murder—the proper constitutional focus is on providing the jury with adequate information and guidance to safeguard against arbitrary or capricious capital sentences.

Because the FDPA satisfactorily provided those constitutionally mandated safeguards here, the fact that federal juries have only infrequently exercised their discretion to vote capital punishment for crimes involving intentional murder does not support a conclusion that a death sentence in Aquart's case violates due process.[37]

### 4.    Necessary and Proper Clause Challenge

Aquart argues that, in providing a death sentence for his crimes, Congress exceeded its constitutional authority "[t]o make all Laws which shall be necessary and proper for carrying into Execution" the powers constitutionally vested in that branch of the federal government.  U.S. CONST. art. I, § 8, cl. 18.  It has long been recognized that the word "necessary," as used in the Constitution, does not mean "*absolutely* necessary."  *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413–15 (1819) (Marshall, C.J.) (emphasis in original); *accord United States v. Comstock*, 560 U.S. 126, 133–34 (2010).  Rather, a

---

[37] The conclusion finds further support in Justice Scalia's concurring opinion in *Glossip v. Gross*, which echoes *McCleskey*'s reasoning*:*

> It is because these questions [informing a capital sentencing decision] are contextual and admit of no easy answers that we rely on juries to make judgments about the people and crimes before them.  The fact that these judgments may vary across cases is an inevitable consequence of the jury trial, that cornerstone of Anglo-American judicial procedure.  But when a [capital] punishment is authorized by law . . . the fact that some defendants receive mercy from their jury no more renders the underlying punishment "cruel" than does the fact that some guilty individuals are never apprehended, are never tried, are acquitted, or are pardoned.

135 S. Ct. at 2748 (Scalia, J., concurring).

112

law will be deemed necessary and proper if it is "rationally related to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 560 U.S. at 134.

Aquart's federal death sentences were expressly authorized by the two statutes under which he was convicted, 18 U.S.C. § 1959(a)(1) (VICAR) and 21 U.S.C. § 848(e)(1)(A) (CCE murder). We have upheld both these statutes as constitutional exercises of Congress's Commerce Clause authority. *See United States v. Walker*, 142 F.3d 103, 111 (2d Cir. 1998) (CCE murder); *United States v. Torres*, 129 F.3d 710, 717 (2d Cir. 1997) (VICAR). Given this controlling authority, Aquart does not argue that either statute is facially unconstitutional in authorizing the death penalty. Rather, he argues that a capital sentence is not necessary and proper here because of the essentially local character of the murders at issue and the fact that he was convicted in Connecticut, a state that now prohibits the death penalty both legislatively and under its own Constitution. *See State v. Santiago*, 318 Conn. 1, 52–86 (2015).[38]

Neither argument persuades us. In support of the first, Aquart relies on *United States v. Morrison*, 529 U.S. 598 (2000), and *United States v. Lopez*, 514 U.S. 549 (1995). In *Morrison*, the Supreme Court

---

[38] Aquart's arguments focus on the fourth and fifth considerations employed by the Supreme Court in *United States v. Comstock* to determine whether a civil commitment statute was rationally related to Congress's implied authority to enact criminal laws and administer the federal criminal justice system. These considerations are (1) the breadth of the Necessary and Proper Clause, (2) the history of federal involvement in the relevant area, (3) the rationale for and purpose of the challenged statute, (4) the statute's accommodation of state interests, and (5) the connection between the statute and Congress's enumerated powers. *See* 560 U.S. at 133–46.

ruled that the Commerce Clause did not authorize Congress federally to criminalize gender-motivated violence because it was not, "in any sense of the phrase, economic activity." 529 U.S. at 613; *see id.* at 618 (explaining that "punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States"). In *Lopez*, the Supreme Court similarly invalidated a federal statute criminalizing the possession of a firearm in a school zone. Although the government there urged an interstate nexus because insurance spread the cost of violent crime throughout the population and reduced the willingness of persons to travel to areas that were perceived as dangerous, the Supreme Court concluded that such a piling of "inference upon inference" would impermissibly convert Congress's Commerce Clause authority into "a general police power of the sort retained by the States." *United States v. Lopez*, 514 U.S. at 567.

The exercise of federal jurisdiction here raises none of the concerns identified in *Morrison* and *Lopez*. Both the VICAR and CCE murder statutes require a "strong relationship" between the charged murders and commerce-affecting criminal activity. *United States v. Mapp*, 170 F.3d at 336 (stating that required "strong relationship" between predicate murder and racketeering activity affecting interstate commerce eliminates risk of "making purely local crimes a matter of federal concern"); *see United States v. Aguilar*, 585 F.3d 652, 658 (2d Cir. 2009) (same regarding "substantive connection" that CCE murder statute requires between drug enterprise and charged

114

murder). That strong relationship was established here by evidence showing that Aquart's express motive in killing Tina Johnson and her associates was to eliminate a rival drug dealer. The murder of such a rival directly affected interstate commerce both by actually eliminating one retail competitor and by chilling possible competition from others, thus maintaining the monopoly of Aquart's racketeering enterprise. *See Gonzales v. Raich*, 545 U.S. at 19 n.29 (recognizing Congress's power to regulate both lawful and unlawful markets under Commerce Clause); *United States v. Umaña*, 750 F.3d 320, 337 (4th Cir. 2014) ("Congress could rationally have concluded that proscribing reputation-enhancing violence committed by members of a criminal enterprise would disrupt the interstate commerce that the enterprise itself engages in.").

The second part of Aquart's necessary-and-proper challenge maintains that the lack of any "link" between the death penalty and Congress's exercise of an enumerated power precludes the federal government from asserting an interest "in execution as a *particular* punishment" that is superior to Connecticut's interest in barring that punishment within its borders. Appellant's Supp. Br. 12/15/2015, 15 (emphasis in original). The argument is unpersuasive for several reasons.

First, to the extent Aquart's highlighting of the word "particular" implies that a federal capital sentence may be imposed in Connecticut only if it is absolutely necessary to Congress's exercise of Commerce Clause authority—in short, if no lesser punishment can be effective—we explained at the outset that the Supreme Court has

115

consistently rejected such a construction of the Necessary and Proper Clause. *See McCulloch v. Maryland,* 17 U.S. (4 Wheat.) at 413–15; *accord United States v. Comstock*, 560 U.S. at 134–35 (collecting cases). Rather, the Supreme Court has construed the Necessary and Proper Clause to "make[] clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *United States v. Comstock*, 560 U.S. at 133–34, (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) at 413, 418).[39] Congress having determined that capital punishment is useful and conducive to its exercise of Commerce Clause authority over drug and racketeering enterprises whose members resort to murder, the Necessary and Proper Clause does not require it further to demonstrate a need for that "*particular* punishment." Appellant's Supp. Br. 12/15/2015, 15 (emphasis in original).

Second, to the extent Aquart's argument suggests that the link between capital punishment and Congress's exercise of Commerce Clause authority is too remote to be necessary and proper, it is similarly defeated by precedent. The Supreme Court has explicitly rejected the idea that Congress's necessary-and-proper authority "can

---

[39] Chief Justice Marshall famously defined the scope of the Necessary and Proper Clause as follows:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

*McCulloch v. Maryland,* 17 U.S. (4 Wheat.) at 421.

be no more than one step removed from a specifically enumerated power." *United States v. Comstock*, 560 U.S. at 146. Thus, Congress's enumerated Commerce Clause authority supports a number of links, implying, first, the power to enact criminal laws regulating commerce, which in turn implies authority to determine punishments for violations of those laws, including capital punishments, which in turn implies authority to establish a federal prison system to carry out those punishments. Indeed, Congress's power to prescribe punishments for federal crimes has been recognized from the beginning of the Republic. *See McCulloch v. Maryland,* 17 U.S. (4 Wheat.) at 416 ("All admit, that the [federal] government may, legitimately, punish any violation of its laws; and yet, this is not among the enumerated powers of congress."); *accord United States v. Comstock*, 560 U.S. at 137 ("Neither Congress' power to criminalize conduct, nor its power to imprison individuals who engage in that conduct, nor its power to enact laws governing prisons and prisoners, is explicitly mentioned in the Constitution. But Congress nonetheless possesses broad authority to do each of those things in the course of 'carrying into Execution' the enumerated powers 'vested by' the 'Constitution' . . . —authority granted by the Necessary and Proper Clause." (quoting U.S. CONST. art. I, § 8, cl. 18)). Further, among the punishments prescribed by the first Congress in its first identification of federal crimes was the death penalty. *See* Act of Apr. 30, 1790, ch. 9, §§ 1–14, 1 Stat. 112–15. It therefore follows that because Congress's Commerce Clause power supports its enactment of criminal laws such as VICAR and CCE murder, it is necessary and proper for Congress to determine the appropriate punishments for those crimes.

117

To be sure, Congress's exercise of its punitive authority is limited by the Eighth Amendment's prohibition of cruel and unusual punishments. But so long as a federal punishment does not violate that constitutional limitation, it is not somehow rendered constitutionally *un*necessary or *im*proper by the fact that it is imposed in a state that does not employ the punishment for its own state crimes.

That is the third part of Aquart's argument: a federal death sentence is not necessary and proper *in Connecticut* because that state prohibits capital punishment for state crimes. To the extent Aquart's argument implies federal impingement on state sovereignty, it might be understood to invoke the Tenth Amendment. *See* U.S. CONST. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). Aquart, however, specifically disclaims any Tenth Amendment challenge (just as he disclaims any Commerce Clause challenge). This is not surprising because, as the Supreme Court has explained, the powers "'delegated to the United States by the Constitution' include those specifically enumerated powers listed in Article I"—such as those conferred by the Commerce Clause—"along with the implementation authority granted by the Necessary and Proper Clause"—such as the authority to codify and punish federal crimes affecting interstate commerce. *United States v. Comstock*, 560 U.S. at 144. "Virtually by definition," then, the authority to prescribe punishments for federal crimes is not a "power[] that the Constitution 'reserved to the States.'" *Id*. In short,

"the federal interest in defining the punishment for federal crimes" is not "a matter for local veto." *United States v. Acosta-Martinez*, 252 F.3d 13, 20 (1st Cir. 2001) (rejecting due process and statutory challenges to FDPA in Puerto Rico, which bars death penalty under its own constitution).[40]

This conclusion applies with equal, if not greater, force to Aquart's attempt to locate such veto power in the Necessary and Proper Clause. To explain, a Tenth Amendment challenge at least suggests that the Constitution reserved to *all* the states some authority respecting federal sentences. By contrast, Aquart's argument suggests that the Necessary and Proper Clause gives each individual state the power to veto federal laws authorizing capital punishment for certain federal crimes. This is at odds with our very constitutional design of two governments, "one state and one federal, each protected from incursion by the other." *Printz v. United States*, 521 U.S. 898, 920 (1997) (internal quotation marks omitted) (making point in declaring unconstitutional federal law requiring state officials to enforce aspects of federal gun law). It is further at odds with the idea

---

[40] The argument in *Acosta-Martinez* was premised on 48 U.S.C. § 734, which extends United States laws to Puerto Rico except as "locally inapplicable," rather than the Tenth Amendment, which applies only to the states. *See Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322, 344–45 (1st Cir.), *aff'd*, 136 S. Ct. 1938 (2016). The First Circuit there concluded that the FDPA applies in Puerto Rico just as it applies in the states that prohibit the death penalty because Congress "retains federal power over federal crimes." *United States v. Acosta-Martinez*, 252 F.3d at 20; *see United States v. Johnson*, 900 F. Supp. 2d 949, 962–63 (N.D. Iowa 2012) (holding that federal legislation making death penalty applicable for federal crimes does not violate Tenth Amendment "even in states that do not authorize capital punishment under state law"); *United States v. Tuck Chong*, 123 F. Supp. 2d 563, 566–68 (D. Haw. 1999) (rejecting Tenth Amendment challenge to imposition of federal death penalty in Hawaii, which does not authorize death penalty under state law).

that the Constitution "was designed for the common and equal benefit of all the people of the United States" and, thus, must apply equally throughout the states. *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 348 (1816) (Story, J.).

The Necessary and Proper Clause warrants no exception. Nothing in the Constitution contemplates that Congress's exercise of its constitutional authority may be necessary and proper in one state and not in another depending on how each state treats the matter at issue under its own laws. Indeed, such an argument would appropriately be rejected out of hand if the state laws at issue opposed not the death penalty, but the sorts of civil rights, environmental, or gun trafficking requirements that are enforced through numerous federal criminal laws not always mirrored in the legislation of each state. *Cf. United States v. Fell*, 571 F.3d 264, 270 (2d Cir. 2009) (Raggi, J., with Jacobs, C.J., Cabranes, Parker, Wesley, Livingston, JJ., concurring in the denial of rehearing *en banc*) (rejecting Sixth Amendment argument demanding "special solicitude" in selecting federal capital jury for "local values" opposing death penalty).

Nor is a different conclusion warranted by *Comstock*'s consideration of whether the federal civil-commitment statute there at issue properly accounted for state interests. *See* 560 U.S. at 143–44. That consideration was limited to assuring that the statute neither violated the Tenth Amendment nor "otherwise improperly limit[ed] the scope of powers that remain with the States." *Id.* at 144 (internal quotation marks omitted). Aquart does not—and could not—here argue a violation of the Tenth Amendment. Insofar as he argues that

a federal death penalty "usurps Connecticut's traditional authority to determine the appropriate sanctions for murder committed within the state," Appellant's Supp. Br. 12/15/2015, 12, the argument fails as a matter of law because Connecticut's authority is limited to determining sanctions for murders committed in violation of its own laws. Neither the VICAR nor CCE murder statute places any limits on Connecticut's authority to determine the appropriate punishment for state law murders. Nor does either statute issue any directives to the Connecticut legislature, the concern at issue in *New York v. United States*, 505 U.S. 144, 188 (1992) (holding federal statute requiring states to accept ownership of waste or regulate according to instructions of Congress exceeded enumerated powers). Further, neither these statutes nor the FDPA conscripts state officials to carry out federal commands, the concern identified in *Printz v. United States*, 521 U.S. at 935 (holding federal law requiring state officials to conduct background checks on prospective handgun purchasers to violate state sovereignty and not to be enforceable as necessary and proper to execution of Commerce Clause).

In sum, there is no merit to Aquart's argument that his capital sentences exceeded Congress's authority under the Necessary and Proper Clause.

### 5. "Originalist" Challenge

Finally, the panel requested further briefing on the "original" meaning of the Cruel and Unusual Punishments Clause within our system of federalism. In response, Aquart argues that his death

sentence violates the original meaning of the word "unusual" because (1) it marries a new punishment—death—to crimes for which it was not previously available, *i.e.*, VICAR and CCE murder; and (2) it exceeds the punishment available in the state of Connecticut for comparable crimes.[41]

Although we here discuss these "originalist" challenges, we acknowledge at the outset that the Supreme Court does not construe the Eighth Amendment's Cruel and Unusual Punishments Clause according to an original understanding of what was "cruel and unusual." Rather, it has ruled that "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Atkins v. Virginia*, 536 U.S. at 311–12 (internal quotation marks omitted); *accord Moore v. Texas*, 137 S. Ct. 1039, 1048 (2017); *Roper v. Simmons*, 543 U.S. at 560–61. In following that principle, the Court has not drawn "precise distinctions between cruelty and unusualness" or clearly indicated that the two words bear qualitatively different meanings. *Trop v. Dulles*, 356 U.S. 86, 100 n.32 (1958) (plurality opinion). We are, of course, bound by Supreme Court precedent in applying the Cruel and Unusual Punishments

---

[41] Our concurring colleague states that he does not find the parties' supplemental briefs all that helpful, suggesting that the arguments advanced were not fully made out and might better be developed on remand if Aquart deems it appropriate. *See* Concurring Op., *post* at 6–7. We cannot agree. The originalist hypothesis put to the parties by the panel is not one requiring record development of fact, and there is no reason to think that able counsel did not develop the arguments fully and to the best of their ability. The hypothesis simply lacks persuasive support in law and history, and there is no reason for this court not to say so.

Clause. Nonetheless, we will now explain why Aquart's "originalist" arguments as to the word "unusual" do not persuade.

> a. Extending Capital Punishment to VICAR and CCE Murders

Aquart's first "originalist" argument relies on a law review article, which concludes that, "[a]s used in the Eighth Amendment, the word 'unusual' was a [legal] term of art," derived from the common law, "that referred to government practices that are contrary to 'long usage' or 'immemorial usage.'" John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 NW. U. L. REV. 1739, 1745 (2008) [hereinafter "Stinneford, *Original Meaning*"].[42] The author submits that historical evidence from 17th and 18th Century England and America indicates that three categories of punishment were recognized as "unusual" under this long-usage formulation:

---

[42] The phrase "cruel and unusual punishments" first appeared in the English Bill of Rights of 1689, in response to abusive and unprecedented sentencing practices by royal judges under the Stuarts. *See* Stinneford, *Original Meaning*, at 1748; *see also Harmelin v. Michigan*, 501 U.S. 957, 967–69 (1991) (opinion of Scalia, J.) (detailing link between abuses attributed to Lord Chief Justice Jeffreys of the King's Bench and the English Bill of Rights' prohibition on "cruell and unusuall Punishments"). When the phrase reappeared in America in Virginia's 1776 Declaration of Rights, *see* Stinneford, *Original Meaning,* at 1748, its English origins as a restraint on a lawless judiciary were well known throughout the colonies, *see* Akhil Reed Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 87, 279 (1998) ("[E]very schoolboy in [Eighteenth Century] America knew that the English Bill of Rights' 1689 ban on excessive bail, excessive fines, and cruel and unusual punishments—a ban repeated virtually verbatim in the Eighth Amendment—arose as a response to the gross misbehavior of the infamous Judge Jeffreys.").

(1) punishment practices that were either entirely new or were foreign to the common law system, including—perhaps primarily—those that were used in civil law jurisdictions; (2) punishments that were newly married to crimes with which they had not traditionally been associated—for example, Parliament's decision to make it a capital offense to cut down a cherry tree in an orchard, among numerous other minor offenses; and (3) traditional punishments that had fallen completely out of usage and were then revived, such as the practice of 'ducking' in cold water a woman convicted of being a common scold.

*Id.* at 1745–46 (footnotes and internal quotation marks omitted).

We need not here decide whether this persuasively states the original meaning of the word "unusual" as used in England and transplanted to America's Eighth Amendment because Aquart fails, in any event, to bring his challenged death sentences within the second quoted category on which he relies, *i.e.*, a punishment newly married to crimes for which it had not traditionally been associated.[43]

---

[43] There is no ready agreement on the original meaning of the Cruel and Unusual Punishments Clause. The article posits that English sources, especially Coke and Blackstone, show that, within the common law tradition, "unusual" meant contrary to long usage, hence the outrage at judicial imposition of sentences unprecedented at common law. *See* Stinneford, *Original Meaning*, at 1745, 1767–92. But Justice Scalia, after reviewing some of those same sources, concluded that "unusual" could not have had the same meaning in the Eighth Amendment because "[t]here were no common-law punishments in the federal system." *Harmelin v. Michigan*, 501 U.S. at 975 (opinion of Scalia, J.). Thus, the Eighth Amendment's Cruel and Unusual Punishments Clause had to have been

To the extent the particular concern in the second category is extending capital punishment to minor offenses, akin to the cherry tree example derived from Blackstone,[44] Aquart can hardly claim that his capital crimes are of that sort. They are murders. To be sure, those murders are federal crimes because they were committed in aid of

---

"meant as a check not upon judges but upon the Legislature." *Id.* at 975–76. So understood, Justice Scalia maintained that the original constitutional meaning of "unusual" in the Eighth Amendment was its common meaning, *i.e.,* "such as [does not] occu[r] in ordinary practice." *Id.* at 976 (alterations in original) (internal quotation marks omitted).

The Stinneford article maintains that there is a significant difference between "ordinary practice" and "long usage." Under the former formulation, "any punishment that was permitted at the time of the Eighth Amendment's ratification must necessarily be permitted today because Justice Scalia sees the clause as embodying the standards of decency that prevailed in 1790." Stinneford, *Original Meaning*, at 1818. By contrast, a long-usage formulation is not tied to the Eighteenth Century. Rather, it operates at the time of challenge:

> If a punishment enjoys long usage, this is powerful evidence of reasonableness because it has enjoyed the consent of the people over a long period of time. If a punishment does not enjoy long usage, either because it is completely new or because it is being reintroduced after having fallen out of usage for a significant period of time, then it does not enjoy any presumption of reasonableness.

*Id.* at 1819.

As noted, we do not choose between these formulations because Aquart fails to show that his capital sentences are constitutionally unusual even under the long-usage formulation on which he relies. We nevertheless note that the amendment's original meaning is open to debate. *See Trop v. Dulles*, 356 U.S. at 100–01 (plurality opinion) (observing that words of Eighth Amendment are "not precise" but must draw meaning from evolving standards of decency); *id.* at 100 n.32 (observing that "[i]f the word 'unusual' is to have any meaning apart from the word 'cruel,'" it "should be the ordinary one, signifying something different from that which is generally done").

[44] *See* Stinneford, *Original Meaning,* at 1791 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *4 (critiquing Parliament for deviating from common law in making minor crimes capital offenses, including cutting down cherry tree in orchard or breaking down fishpond so that fish escape)).

racketeering and a continuing drug enterprise. Racketeering and drug trafficking are serious crimes in themselves, but not ones that Congress originally punished by death. *See* Pub. L. No. 91-513, Title II, § 408, 84 Stat. 1265 (codified as amended at 21 U.S.C. § 848); Pub. L. No. 98-473, Title II, § 1002, 98 Stat. 2137 (codified as amended at 18 U.S.C. § 1959). That, however, does not support Aquart's argument that Congress's addition of a death sentence to the VICAR and CCE murder statutes is unconstitutionally "unusual." Such punishment is prescribed only for VICAR and CCE *murders*. *See* 21 U.S.C. § 848(e); 18 U.S.C. § 1959(a)(1). Indeed, it was only proof of murder that aggravated Aquart's VICAR and CCE crimes to capital offenses and made him eligible for a death sentence. Thus, murder, and nothing less, is the pertinent conduct for purposes of considering Aquart's claim that Congress impermissibly married a new capital punishment to a crime where it was not previously available.

Analyzed in that context, Aquart's argument fails because he cannot show that capital punishment has not traditionally been associated with the crime of murder. To the contrary, it is the crime most frequently associated with that punishment. Indeed, "[t]he common-law rule imposed a mandatory death sentence on all convicted murderers." *Gregg v. Georgia*, 428 U.S. at 176–77. At the time of the Constitution's ratification, all thirteen states treated premeditated murder as a capital crime, punishable by a mandatory death sentence. *See Woodson v. North Carolina*, 428 U.S. 280, 289 (1976); *see also* HUGO ADAM BEDAU, THE DEATH PENALTY IN AMERICA, 5–6, 15, 27–28 (1967).

Nor can Aquart show that an "originalist" meaning of "unusual" precluded Congress from punishing newly codified federal murder crimes with death. The same Congress that drafted the Eighth Amendment enacted the Crimes Act of 1790, which, in defining some of the first federal crimes, made murders on the high seas or within the sole and exclusive jurisdiction of the United States punishable by death. *See* Act of Apr. 30, 1790, ch. 9, §§ 3, 8, 1 Stat. 112–14; *see generally Printz v. United States*, 521 U.S. at 905 (stating that "early congressional enactments provid[e] contemporaneous and weighty evidence of the Constitution's meaning" (alteration in original) (internal quotation marks omitted)).

Further, Aquart does not argue, and cannot show, that capital punishment is being revived in his case after having fallen "completely out of usage" for murder, so as to be constitutionally "unusual" under the third prong of Stinneford's originalist analysis. *See* Stinneford, *Original Meaning*, at 1746. Indeed, such a *completely-out-of-use* standard appears to be more demanding for declaring a punishment unconstitutional than the Supreme Court's evolving-standards-of-decency test. *See, e.g.*, *Roper v. Simmons*, 543 U.S. at 564–66 (holding death penalty for juveniles cruel and unusual punishment when number of authorizing states declined from 25 to 20). Despite evidence of declining use of capital punishment, the Supreme Court has not declared the punishment categorically unconstitutional for intentional murder under that standard. *See supra*, Discussion Section II.D.1. We can hardly do so on a more demanding theory.

127

What Aquart does argue in support of this part of his originalist challenge is that Congress lacks a sufficient federal interest in the murders carried out in violation of the VICAR and CCE statutes to add capital punishment to these crimes. That argument, however, is not grounded in an originalist construction of the Cruel and Unusual Punishments Clause. Rather, it is a variation on Aquart's argument that criminalizing VICAR and CCE murders exceeds Congress's Commerce Clause authority under the Necessary and Proper Clause. We have already rejected that argument as meritless, *see supra*, Discussion Section II.D.4., and we are no more persuaded by it when recast as an "originalist" challenge under the Eighth Amendment.

> b.  <u>Federalism and the Federal Death Penalty in Connecticut</u>

The second part of Aquart's originalist challenge invokes federalism to argue that whether a federal punishment is constitutionally "unusual" must be determined by reference to the punishments permitted in the state of prosecution.

This argument also derives not from any controlling Eighth Amendment precedent but from a law review article positing that the federalism expectations of anti-Federalist critics of the Constitution, together with their success in securing a Bill of Rights, support a state-specific construction of the Cruel and Unusual Punishments Clause to make unconstitutional any federal criminal sentence that "punishes more harshly than the State where the conduct occurred." Michael J. Zydney Mannheimer, *Cruel and Unusual Federal*

128

*Punishments*, 98 IOWA L. REV. 69, 122 (2012) [hereinafter "Mannheimer, *Cruel and Unusual*"].  Such a construction of the Eighth Amendment has the potential for considerable mischief, insofar as states that unsuccessfully opposed nationwide federal criminal legislation in certain areas—*e.g.*, firearms, civil rights, or environmental practices—might attempt to render those laws virtually ineffective within their borders by enacting parallel local laws allowing only negligible punishments.  But even without this concern, Aquart's second "originalist" argument does not persuade.

First, to the extent the argument rests on purported anti-Federalist expectations, the foundation is hardly a solid one.  As historians of the period have observed, "there were abundant differences of opinion and many 'original understandings' about the nature of federalism among the founders of the Republic."  KATHRYN PREYER, *Jurisdiction to Punish: Federal Authority, Federalism, and the Common Law of Crimes in the Early Republic*, *in* BLACKSTONE IN AMERICA: SELECTED ESSAYS OF KATHERINE PREYER 185, 186 (Mary Sarah Bilder et al. eds., 2009).  Such differences appeared even within the ranks of the anti-Federalists.  *See* PAULINE MAIER, RATIFICATION: THE PEOPLE DEBATE THE CONSTITUTION, 1787–1788 297 (2010) [hereinafter "MAIER, RATIFICATION"] (quoting Madison's observation during Virginia ratifying convention of "a great contrariety of opinions among the Gentlemen in the opposition" to Constitution (citing 10 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1500–03, 1507 (John P. Kaminski et al. eds., 1993))).  Thus, even if one can conclude that anti-Federalists generally viewed

the states as "'sure guardians of the people's liberty'" against federal infringement of their rights, MAIER, RATIFICATION, at 463 (quoting James Madison, Speech to Congress (June 8, 1789), *reprinted in* 11 THE PAPERS OF JAMES MADISON 207 (Robert A. Rutland et al., eds., 1979)), that does not support an "originalist" construction of the Bill of Rights to apply differently from state to state.[45]

The noted concerns with reading such federalism expectations into the Bill of Rights generally counsel particular caution when applied to the Eighth Amendment because of the paucity of relevant framing era statements. *See* Mannheimer, *Cruel and Unusual*, at 101 (acknowledging existence of "only a handful" of statements). Aquart quotes two statements (reproduced in the margin) to support his urged "originalist" construction, one from George Mason, the other from Patrick Henry.[46] These were not, of course, the only statements

---

[45] On such a view, any number of constitutional standards identified in the Bill of Rights—such as the "reasonableness" of a search, the "probable cause" necessary for a warrant, the circumstances constituting "double jeopardy," and the procedures satisfying "due process"—could all vary from state to state. U.S. CONST. amend. IV, amend. V.

[46] In his *Objections to the Constitution of Government Formed by the Convention* (1787), Mason stated:

> Under their own Construction of the general Clause at the End of the enumerated powers [the Necessary and Proper Clause] the Congress may grant Monopolies in Trade and Commerce, *constitute new Crimes, inflict unusual and severe Punishments*, and extend their Power as far as they shall think proper, so that the State Legislatures have no Security for the Powers now presumed to remain to them; or the People for their Rights.

made by these men, or other anti-Federalists, in the course of the ratification debates and, thus, it cannot be assumed that they express their only concerns with the proposed Constitution.[47] Nevertheless, to the extent these are the statements Aquart highlights as best supporting his argument, they cannot bear the weight he assigns them.

Mason's particular focus in the quoted statement is the Necessary and Proper Clause, which he feared would allow Congress

---

Mannheimer, *Cruel and Unusual*, at 101–02 (emphasis added by Mannheimer) (quoting George Mason, *Objections to the Constitution of Government Formed by the Convention* (1787), *reprinted in* 2 THE COMPLETE ANTI-FEDERALIST 13 (Herbert J. Storing ed., 1981)).

In his June 16, 1788 speech in the Virginia ratifying convention, Henry stated:

> Congress from their general powers may fully go into the business of human legislation. They may legislate in criminal cases from treason to the lowest offence, petty larceny. They may define crimes and prescribe punishments. In the definition of crimes, I trust they will be directed by what wise Representatives ought to be governed by. But when we come to punishments, no latitude ought to be left, nor dependence put on the virtues of Representatives. What says [the Virginia] Bill of Rights? "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Are you not therefore now calling on those Gentlemen who are to compose Congress, to prescribe trials and define punishments without this controul?

*Id.* at 102–03 (alteration in Mannheimer) (quoting Patrick Henry, Speech in the Virginia State Ratifying Convention (June 16, 1788), *reprinted in* 5 THE COMPLETE ANTI-FEDERALIST 248 (Herbert J. Storing ed., 1981)).

[47] *See generally* MAIER, RATIFICATION, at 255–319 (discussing Virginia ratifying convention debates generally). Henry, in particular, found fault with almost every part of the proposed Constitution, including its preamble because it referred to "We, the People" instead of "we the States." *Id.* at 264, 266 (observing that "[i]t was no easy thing defining what exactly Henry proposed" in his speeches at Virginia ratifying convention, because "[n]o amendment . . . was likely to address his fundamental criticism of the Constitution: that its authority came from the people instead of the states").

131

to extend and abuse federal power—for example, by identifying new crimes and imposing unusual and severe punishments—to the detriment of the states' presumably retained power in that area. *See* MAIER, RATIFICATION, at 46 (noting Mason's earlier expression of similar concern at Constitutional Convention). Henry's statement faults the Constitution for extending criminal power to the federal government unchecked by the sorts of prohibitions on excessive bail, excessive fines, and cruel and unusual punishments found in Virginia's 1776 Bill of Rights (drafted by Mason). Neither statement, however, suggests (much less, states) that these concerns should be addressed by an amendment that not only prohibits cruel and unusual federal punishments but also affords each state the power to determine what federal punishments are impermissibly cruel and unusual within its borders.

Nothing in Virginia's forty proposed amendments to the Constitution hints at the states' exercise of such veto power over federal legislation. The first twenty amendments urged the addition of a bill of rights virtually identical to Virginia's Bill of Rights; the second twenty urged "Amendments to the Body of the Constitution." CREATING THE BILL OF RIGHTS: THE DOCUMENTARY RECORD FROM THE FIRST FEDERAL CONGRESS 17–21 (Helen E. Veit et al. eds., 1991) [hereinafter "CREATING THE BILL OF RIGHTS"].[48] The thirteenth

---

[48] This comports with the double use of the word "amendment" during the ratification debates to reference both the addition of a bill of rights (first unsuccessfully urged at the Constitutional Convention by George Mason and Elbridge Gerry), and "changes in the structure and powers of the new federal government" demanded by anti-Federalists during the ratification debates. *See* CREATING THE BILL OF RIGHTS, at ix.

amendment in the first part of Virginia's proposal states simply "[t]hat excessive Bail ought not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *Id.* at 18. Nowhere does it urge that this right, when added to the federal Constitution, should be construed by reference to the maximum punishments permitted within each state. Meanwhile, the first amendment in the second part of Virginia's proposal, which speaks directly to federalism, states "[t]hat each State in the Union shall respectively retain every power, jurisdiction and right which is not by this Constitution delegated to the Congress of the United States or to the departments of the Federal Government." *Id.* at 19. Neither this proposal, nor the Tenth Amendment to which it led, however, suggests that among such powers is the authority of each state to prevent the federal government from enforcing duly enacted federal criminal laws within the state's borders.

Such a construction cannot be inferred simply by coupling the common law origins of the English Bill of Rights' ban on cruel and unusual punishments with the state-specific adoption of the common law in America. *See* Mannheimer, *Cruel and Unusual*, at 90, 95–96, 109–20. Even English authority recognized that common law must yield to statute. *See* Stinneford, *Original Meaning*, at 1787, 1789 (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES *89). And federal crimes and punishments can be established only by statute. *See United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 32–34 (1812) (rejecting federal common law of crimes and requiring codification of federal criminal law). Thus, because Congress could enact criminal

133

statutes that departed from common law, anti-Federalists may well have thought it necessary to amend the Constitution expressly to deny Congress the power to enact cruel and unusual punishments. *See Harmelin v. Michigan*, 501 U.S. at 975–76 (opinion of Scalia, J., joined by Rehnquist, C.J.). But neither the text of the amendment nor its anti-Federalist origin supports an "originalist" argument that the Clause would then be construed differently in each of the states depending on the maximum punishments prescribed by the state for its own crimes.[49]

Second, and in any event, Aquart's state-focused "originalist" construction of the Eighth Amendment is precluded by two already referenced strands of Supreme Court precedent. *See supra*, Discussion Sections II.D.1. & 4. The first, originating in Justice Story's pronouncement in *Martin v. Hunter*'s *Lessee* that "[t]he constitution of the United States was designed for the common and *equal* benefit of all the people of the United States," 14 U.S. (1 Wheat.) at 348 (emphasis added), establishes that the Constitution must apply equally throughout the states. There would be no "equal benefit" if the Eighth Amendment were construed to allow a federal punishment in one state that it bars in another. How would one explain to two federal defendants each convicted of comparable

---

[49] Nor is such a conclusion supported by the assertion that, although "the ultimate goal of the Bill of Rights was to protect individual rights, . . . it did so by ensuring the States' right to self-governance." Mannheimer, *Cruel and Unusual*, at 100. To the extent the States' right to self-governance is safeguarded by the Constitution, that was done in the Guarantee Clause of the pre-amendment Constitution, not in the Bill of Rights. *See* U.S. CONST. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government . . . .").

VICAR and CCE murders—one in Texas, the other in Connecticut—that the same Constitution that allows the Texas defendant to be executed prohibits subjecting the Connecticut defendant to that punishment because Texas employs capital punishment while Connecticut does not? There is no satisfactory answer consistent with the controlling rule that the Constitution and laws apply equally across the states. *See United States v. Begay*, 42 F.3d 486, 498–99 (9th Cir. 1994) (explaining that "federal criminal statute of nationwide applicability," for which situs is not element, "applies equally to everyone everywhere within the United States"); *see also United States v. Mitchell*, 502 F.3d at 946–48, 978 (applying principle to reject challenge to FDPA's application to Indian tribes).[50]

The second line of Supreme Court precedent defeating Aquart's state-specific "originalist" argument is that referenced at the start of Discussion Section II.D., *supra*. It eschews original meaning in favor of evolving standards of decency in construing the Eighth Amendment's Cruel and Unusual Punishments Clause. *See Atkins v. Virginia*, 536 U.S. at 311–12; *accord Moore v. Texas*, 137 S. Ct. at 1048; *Roper v. Simmons*, 543 U.S. at 560–61. That standard factors state views into the identification of cruel and unusual federal punishments, but not so the maximum penalty set by each state for particular conduct

---

[50] This is a recurring problem with attempts to enlist federalism to mount state-specific challenges to capital punishment. *See generally United States v. Fell*, 571 F.3d at 271 (Raggi, J., concurring in denial of rehearing *en banc*) (raising same question in rejecting argument that federalism interests underlying Vicinage Clause, *see* U.S. CONST. amend. VI, require different approaches to qualifying federal capital juries depending on whether state of prosecution authorizes or prohibits death sentence).

135

becomes the maximum allowable federal punishment in that state for comparable conduct, as Aquart urges. Rather, Supreme Court precedent holds that the maximum sentences prescribed by various states are properly considered *in the aggregate* because it is in that form that they can serve as a proxy for a "national consensus" as to when an employed federal punishment has come to be recognized as cruel and unusual. *See Kennedy v. Louisiana*, 554 U.S. at 422–23, 426; *see also United States v. Fell*, 571 F.3d at 274 (Raggi, J., concurring in denial of rehearing *en banc*) (collecting cases applying this approach to identify cruel and unusual state punishments). We are not ourselves free to substitute a state-specific standard for this consensus one and to conclude therefrom that the FDPA death sentences constitute cruel and unusual punishment in Connecticut.

In sum, history does not support, and precedent precludes, Aquart's urged originalist construction of the Eighth Amendment to bar his capital sentences because they were imposed by a federal court sitting in Connecticut.

**CONCLUSION**

To summarize, we conclude as follows:

1. Aquart's challenges to the jury's guilty verdict fail on the merits.

 a. The trial evidence is sufficient to permit a reasonable jury to find both the interstate commerce and the

136

motive elements of the VICAR counts proved beyond a reasonable doubt.

b. Aquart's post-verdict claim of perjury fails because he has not made the threshold showing of knowing falsehood by either John Taylor or Lashika Johnson, which showing is necessary to seek relief from conviction, or even a hearing.

c. The record does not support Aquart's claim of prosecutorial misconduct in rebuttal summation, let alone misconduct denying him a fair trial.

2.  Insofar as Aquart challenges prosecution misconduct at the penalty proceeding of trial, we identify error in both its attempts (a) on cross-examination, to elicit its own disbelief of hearsay declarant Efrain Johnson, and (b) on summation, to denigrate the defense for pursuing inconsistent theories at the guilt and penalty phases of trial. While the former error, by itself, would not warrant vacatur of sentence and remand for a new penalty proceeding, such relief is warranted when the former error is considered together and in context with the serious summation error. Other claims of prosecutorial misconduct fail on the merits.

3.  The record evidence was sufficient to allow a reasonable jury to find proved beyond a reasonable doubt both the substantial-planning-and-premeditation and the

137

multiple-killings aggravators that it relied on in reaching its penalty decision.

4.  Aquart's constitutional challenges to the death penalty fail.

    a. In the face of controlling Supreme Court and our own precedent refusing to declare the death penalty *per se* unconstitutional for intentional murder under the Eighth Amendment, this panel cannot do so.

    b. Proportionality review is not constitutionally required for death sentences voted under the carefully drafted FDPA but, even if it were, Aquart's sentence was not so disproportionate as to be unconstitutional.

    c. The infrequency of death sentences in federal capital cases does not manifest arbitrariness because (a) the FDPA properly channels jury discretion, and (b) such infrequency is informed by a capital jury's limitless authority not to vote for death (but to show mercy), which does not raise constitutional concerns.

    d. The FDPA's authorization of capital punishment for VICAR and CCE murders does not exceed Congress's authority under the Necessary and Proper Clause to define crimes affecting interstate commerce and to prescribe punishments, and no different conclusion is

138

warranted because Connecticut, the state where Aquart was federally prosecuted, no longer permits capital punishment for state crimes.

e. Even if the Supreme Court's evolving-standards-of-decency test for cruel and unusual punishments allowed this court to apply an "originalist" construction to the Eighth Amendment prohibition of such punishments, the "originalist" evidence Aquart cites does not support his urged state-specific application of constitutional rights to prohibit FDPA capital sentences in Connecticut while allowing such federal sentences in other states.

For the reasons stated, the judgment of conviction is AFFIRMED as to defendant's guilt; his capital sentence is VACATED and the case is REMANDED for a new penalty proceeding consistent with this opinion.

CALABRESI, *Circuit Judge*, concurring in part and concurring in the result:

I concur and join fully in all of Parts I and II of the Background and Parts I and II, Sections A-C of the Discussion of this extraordinarily well-crafted opinion, with only a couple of caveats, which I will note below. As to Part II, Section D of the Discussion, "Constitutionality Challenges to Death Penalty," I concur and join substantially, all of § 1 and 2a. With respect to the remainder of Part II, D: §§ 2b, 3, 4 and 5, I concur in the result, namely, that nothing in the constitutional arguments that are before us precludes a new penalty proceeding.

Let me explain:

1. At the beginning of Part II of the Discussion, page 51, the opinion reads: "We reject Aquart's sufficiency and constitutionality challenges." As I will discuss shortly, I reject only <u>some</u> of Aquart's constitutionality challenges; others I do not reach and express no views about.

2. At several points in its careful discussion of vouching, the opinion states that "the vouching error . . . —by itself— . . . did not deny Aquart a fair sentencing hearing." *E.g., supra* at 66. The Majority goes on to hold that this error, when viewed together with the "denigration" error, requires vacatur. *Id.* at 57. I agree completely with that conclusion. I am not, however, prepared to say how I would

1

rule if the counter-factual were the case, that is, if the vouching error stood alone. Statements about counterfactuals are just that, and as a result can never be actual holdings, though they may be (as this is) informative and important.

This is especially true in a situation involving vouching. The effect of vouching is—as the opinion repeatedly notes—always contextual. *See, e.g., supra* at 62-63. The precise context that this counter-factual speaks to can never repeat itself, and even if, *per impossibile*, it did, how can we be sure of what we would do when the consequences between life and death would be so different? The Majority has every right to express strongly its view of the limited nature of the error. I, however, must express my view of the limited effect of that expressed opinion. I do so, especially, lest a prosecutor or a district judge be misled by the Majority's perfectly proper expression into repeating the error in this or a later case. The vouching error—by itself—might very likely not suffice to constitute prosecutorial misconduct resulting in prejudicial error, but more than that I dare not say.

3.      The discussion of the constitutionality of the death penalty, both *per se* and as applied to Aquart, presents for me a different problem. There are arguments that Aquart has made below and repeats to us that we are required to deal with,

for if they were valid we would reverse the existing death sentence rather than vacating and remanding for a new sentencing hearing. *See supra* at 94. As far as I can tell, these arguments are all dealt with in the Discussion, Part II.D.1 and Part II.D.2.a. Whatever their merits might perhaps seem to be to me (or perhaps even to a future Supreme Court), they are currently directly contrary to Supreme Court holdings. And, as the Majority opinion elegantly points out, we are now required to follow such holdings even were we to think the High Court would alter them. *See supra* at 95 (citing *Agostini v. Felton*, 521 U.S. 203, 238 (1997) and *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). Accordingly, while I don't necessarily join in every word of the Majority's discussion in these Sections, I join this part of the opinion substantially and in whole.

For different reasons, I don't find part or the whole of some of the other arguments Aquart makes to require answers from us at this time. Under the circumstances, and believing that one should usually avoid constitutional decisions unless required to make them, I decline to speak to them. My reasons are particular to the distinct arguments Aquart makes, and so I treat each one separately:

*§2.b. Whether Aquart's Death Sentence is Constitutionally Disproportionate.*
Because, as the Majority correctly explains, existing Supreme Court Law does not mandate proportionality review, the question of whether, if it did, Aquart would pass that test is entirely hypothetical. (I'm too much an academic to call it academic.)  It need not be reached, and I decline to do so.

*§3. Arbitrariness.*  As the Majority demonstrates, the notion that an individual death sentence imposed in a system that meets the requirements established in *Furman v. Georgia*, 408 U.S. 238 (1972), and *Gregg v. Georgia*, 428 U.S. 153 (1976), can be challenged on arbitrariness grounds is not supported by currently controlling Supreme Court precedent. *See generally Glossip v. Gross*, — U.S. —, 135 S.Ct. 2726 (2015); *Kansas v. Marsh*, 548 U.S. 163 (2006); *McCleskey v. Kemp*, 481 U.S. 279 (1987); *Proffitt v. Florida*, 428 U.S. 242 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976). *But see Glossip*, 135 S.Ct. at 2755-56 (Breyer, *J.,* dissenting) (suggesting that new developments may have undermined the Court's prior decisions holding that the death penalty survives constitutional arbitrariness challenges). This the Majority demonstrates fully and as far as I'm concerned that is all that needs to be said on the matter.

The Majority's discussion of arbitrariness, however, seems to take on what might be "new" arguments based on the effects of arbitrariness. I'm not sure I fully see those arguments in Aquart's briefs to us. They were certainly not made to the District Court in this precise form, and as such I don't believe I need to discuss—let alone decide—them, and decline to do so.

*§4. The Necessary and Proper Challenge.* This Aquart argument, both in its general and in its Connecticut-based form, was clearly not made below. Aquart gives reasons for this, some better than others, and our Court can, of course, choose to deal with arguments that might otherwise be forfeited. The Majority chooses to do so. I think it better not to discuss these arguments now when Aquart still has an opportunity to present them fully to the District Court. Where a death sentence is vacated, as here, and constitutional arguments that aren't manifest winners are presented for the first time on appeal, it seems to me to be by far the better course to let the arguments be made below, where such arguments are best fleshed out. This allows us to avoid making constitutional judgments that may not need to be made at all. *Cf. Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 103 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of

5

constitutionality . . . unless such adjudication is unavoidable.") As it stands, the Majority rules on a less-than-complete prior discussion, as is inevitable where the arguments are raised for the first time to us.

For these reasons, I express no view on Aquart's various Necessary and Proper arguments, but, deeming them forfeited, find that they present no obstacle to our disposition—i.e., vacating and remanding, rather than reversing, the death sentence.

*§ 5. "Originalist" Challenge.* What I just said about the Necessary and Proper arguments is even more true of these arguments. Aquart did not make them below or on his initial appeal. As is our right, we asked for additional briefing. I cannot say that, given the complexity of the issues, I found the supplemental briefs all that helpful on topics that academics are just beginning to explore. If life or death now depended on these arguments, I expect we would do the best we could with them. But, given our vacatur, there is plenty of time for their development below, should Aquart deem that appropriate. We need not, therefore, address these contentions now, and I will not do so.

I also note that these arguments, because they are not fully made out, cannot, in my judgment, be completely treated by the Majority. The opinion is an

interesting first take on claims not perfectly elaborated. But I am far from sure that we can treat this challenge as ultimately settled.

Let me be clear: I cannot, and do not, have any objection to the Majority discussing each and every constitutional argument Aquart may be read as making, whether raised below or not. Our Court is free to do so. Having doubts about the desirability of treating these arguments now, and having no doubt that I am not required to do so, I decline to express a view on the constitutional arguments that I have just listed. And, on my own ground that they need not be heard now, I fully join the Court's conclusion that Aquart's death sentence should be vacated and the case remanded for further proceedings consistent with our Court's opinion.